**SHEFFIELD DEVELOPMENT COMPANY, INC.,**
Petitioner,

v.

**CITY OF GLENN HEIGHTS,**
Texas, Respondent.

No. 02–0033.

Supreme Court of Texas.

Argued Oct. 30, 2002.

Decided March 5, 2004.

Rehearing Denied Sept. 3, 2004.

Bruce M. Kramer, Lubbuck, for Amicus curiae American Planning Association.

Terry D. Morgan, Terry Morgan & Associates, P.C., Dallas, for Amicus curiae City of Cedar Hill, TX & Other.

John Rogers, Office of City Attorney, Dallas, for Amicus curiae City of Dallas, Texas.

B.J. Smith, City Attorney, Mesquite, for Amicus curiae City of Mesquite, Texas.

Angela Washington, Cowles & Thompson, PC, Dallas, for Amicus curiae City of Rowlett, Texas.

Christopher G. Senior, for Amicus curiae National Association of Home.

J. David Breemer, Sacramento, CA, for Amicus curiae Pacific Legal Foundation.

Tobb A. Haba, Bush & Motes, P.C., Arlington, for Amicus curiae Texas Association of Builders.

Scott Houston, Austin, for Amicus curiae Texas Municipal League & Other.

David Michael Hugin, Arthur J. Anderson and W. Mike Baggett, Winstead Sechrest & Minick, P.C., Dallas, for Petitioner.

Robert F. Brown, Edwin P. Voss Jr., Brown & Hofmeister, L.L.P., Dallas, for Respondent.

Justice HECHT delivered the opinion of the Court.

After a twelve-month moratorium on development, the City of Glenn Heights rezoned undeveloped property owned by Sheffield Development Co., reducing the number of residences that could be built on the property. Sheffield contends that the moratorium and the "downzoning" each constituted a taking of its property without adequate compensation in violation of article I, section 17 of the Texas Constitution.[1] Sheffield separately requests a declaration that its development rights became vested when it submitted an application during an earlier hiatus in the moratorium. Following a bench trial on liability issues and a jury trial on damages, the district court rendered judgment for Sheffield for $485,000, plus pre- and post-judgment interest, on the downzoning takings claim only. The court concluded that Sheffield's claim for declaratory relief was not ripe for adjudication. A divided court of appeals concluded that Sheffield was

---

1. Tex. Const. art. I, § 17 ("No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made....").

entitled to recover on both takings claims, affirmed the damages award for the down-zoning claim, and remanded the moratorium claim for trial on damages.[2] The court also concluded that Sheffield's claim for declaratory relief was ripe and remanded it.[3] We hold that Sheffield cannot recover on either takings claim and reverse and render judgment accordingly. We agree with the court of appeals that the case must be remanded to the trial court to determine whether Sheffield fixed its rights by submitting a plat during a hiatus in the moratorium.

# I

## A

The City of Glenn Heights is a growing suburban community (1990 pop. 4,564; 2000 pop. 8,050) south of Dallas astraddle the Dallas/Ellis County border. In 1986, the City zoned a 236–acre tract as Planned Development District 10 (PD 10), allowing most of it to be developed for single-family residences on lots no smaller than 6,500 square feet, with a maximum density of 5.5 dwelling units per acre.[4] The owner at the time platted and developed the first phase of the Stone Creek subdivision on just over 43 acres of the tract. Some of the lots in the first phase met only the minimum required sizeminimum-size, but others were larger. The rest of the property was not developed and remained vacant.

In 1995, the City adopted a comprehensive "Future Land Use Plan" which found that the City had an oversupply of high-density residential areas. The plan designated the neighborhood including Stone Creek primarily as a lower density residential area to contain four to five dwelling units per acre. Though PD 10 zoning allowed a maximum of 5.5 dwelling units

per acre in the relevant area, the first phase of the development had been built with only 3.9 dwelling units per acre, the trial court found, and thus would comply with the new plan. The plan left PD 10 zoning in place. Except for PD 10 and the thirteen other planned development districts (PDs), all property within the City was rezoned according to the plan, increasing most residential lot sizes to 20,000 square feet minimum. The City did not rezone any of the PDs at that time.

In the summer of 1996, Sheffield Development Co. contracted to purchase the undeveloped part of Stone Creek including certain unbuilt lots in the first phase area, in all about 194 acres, for $600 an acre. The price was below market because the owner, a firm headquartered in England, was anxious to liquidate its real estate portfolio in the United States. Sheffield's principal, Gary Sheffield, was an experienced, successful developer of single-family subdivisions. Before closing on the contract, he made a due-diligence investigation of all City regulations and restrictions affecting the property. He met several times with the City Secretary, the City Manager, the Mayor, and various Council members to advise them of Sheffield's plans to continue the Stone Creek development as permitted by the PD 10 zoning and to ascertain that no zoning changes for the property were planned. He specifically requested that Sheffield be notified of any possible zoning changes. No City officer or employee expressed any objection or reservation to Sheffield's plans or stated that the PD 10 zoning might change, but neither did anyone offer any assurance that the zoning would not change.

---

**2.** 61 S.W.3d 634 (Tex.App.-Waco 2001).

**3.** *Id.* at 660.

**4.** Relatively small portions around the perimeter were earmarked for lots of 7500 square feet, 9,000 square feet, and 10,000 square feet.

At the time, the Vested Rights Statute allowed a landowner to vest zoning rights by filing a plat.[5] Through the fall of 1996, representatives of the City met to discuss downzoning PD 10 and imposing a moratorium on development, but they did not tell Sheffield of these meetings for fear that it would quickly close on the purchase of the property, file a plat, and vest its zoning rights. When Sheffield finally did close on the purchase of the property in December, the City Council met three days later in executive session to discuss downzoning PD 10.

On January 6, 1997, without prior notice to Sheffield (the law that now requires four days' notice in such circumstances[6] was not yet in effect), the City Council adopted Resolution No. 287–97 prohibiting the filing and acceptance of plats in PDs until February 6 to allow time to determine whether existing PD zoning was consistent with the comprehensive land use plan. The resolution recited:

> the temporary suspension is solely for the purpose of allowing the City Council to study, in conjunction with the City's planning and administrative officials, the zoning, growth and development related issues and concerns presented by the nonconformity of the City's planned developments with the City's Code and Future Land Use Plan.

Before the end of this moratorium, the City's consultant recommended that PD 10 be rezoned to require lots no smaller than 12,000 square feet, thereby permitting construction of about half the number of houses permitted by PD 10. The consultant also recommended that eleven other PDs

be rezoned, leaving two that would not be rezoned. The recommendation was referred to the City's Planning and Zoning Commission, and the City Council extended the moratorium to March 6.

On March 11, after the moratorium had expired on its face, Sheffield submitted a plat for the development of its property under PD 10 zoning requirements. The City Secretary rejected the plat on the asserted ground that the City Manager had continued the moratorium in effect without Council action. On March 17, the City Council extended the moratorium to May 6.

On March 24, the Planning and Zoning Commission accepted some of the consultant's recommendations for rezoning twelve PDs but rejected the proposed rezoning of PD 10 and four other PDs. Anticipating that the City Council would be unwilling to accept the Commission's decision yet unable to override it—a three-fourths vote, or six of the seven members, was required by the City charter—the City Manager recommended that final action be delayed. Accordingly, on April 21, the City Council rezoned three of the twelve PDs as recommended by the consultant and approved by the Commission, and adopted Resolution No. 292–97, essentially identical to Resolution 287–97, extending the moratorium to July 21. The City Council later extended the moratorium under the same resolution to December 31 and finally to May 15, 1998. From July through December 1997, the City rezoned another seven of the twelve PDs as recommended by the consultant, leaving

**5.** Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147 (codified as Tex. Gov't Code §§ 481.141–.143), "inadvertently" repealed by Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966, and reenacted by Act of April 29, 1999, 76th Leg., R.S., ch. 73, §§ 1, 2 1999 Tex. Gen. Laws 431, 432 (at § 1,

finding that statute was "inadvertently repealed"), and now recodified as Tex. Local Gov't Code §§ 245.001–.006.

**6.** Tex. Loc. Gov't Code §§ 212.134(b) (adopted by Act of May 15, 2001, 77th Leg., R.S., ch. 441, § 1 2001 Tex. Gen. Laws 863).

PD 10 and one other on which the City Council had not acted. At the same time, the City and Sheffield made some efforts to negotiate their differences, but the City had no further studies done or reports made on whether PD 10 should be rezoned.

On April 27, 1998, the Planning and Zoning Commission voted to accept the consultant's January 1997 recommendation to rezone PD 10 and the remaining PD. The same day, the City Council approved the rezoning.

**B**

Sheffield sued the City for inverse condemnation, arguing that both the moratorium and the rezoning of the property violated the takings provision of the Texas Constitution, article I, section 17. Sheffield also sought a declaratory judgment that the plat it filed in March 1997, during the gap in the moratorium periods authorized by the City Council, had been deemed approved by the City's failure to take action on it [7] and vested Sheffield's rights by statute. Sheffield's pleadings did not assert the claim for declaratory judgment as an alternative to the claims for damages.[8] Sheffield asserted a number of other claims against the City, which the trial court denied. Sheffield has not appealed the trial court's rulings on those claims, and thus they do not concern us here.

The parties agreed to try liability issues to the court and damages, if necessary, to a jury. After the bench trial, the court issued findings and conclusions that:

- Sheffield purchased the property expecting that it could be developed under PD 10 zoning, in good faith reliance on the City's representations and the already substantial development of the Stone Creek subdivision;

- the moratorium:
 - "substantially advanced a legitimate governmental interest",
 - "did not unreasonably interfere with Sheffield's rights to use and enjoy its property", and thus
 - "did not constitute a taking without payment of just compensation";
- the rezoning:
 - "substantially advanced a legitimate government interest", but
 - "had a severe economic impact on Sheffield",
 - "deprived Sheffield of its investment-backed expectations",
 - "unreasonably interfered with Sheffield's rights to use and enjoy its property", and thus
 - "constitute[d] a taking without payment of just compensation under Article I, Sec. 17 of the Texas Constitution"

Although the trial court found that no moratorium was in effect from March 6 to 17, 1997, it concluded, without explanation, that Sheffield's claim that its rights were vested by the plat it filed during that period was not ripe.

In both the bench trial and the subsequent jury trial, the parties offered evidence of the value of Sheffield's property before and after the rezoning. Witnesses for Sheffield testified that the property was worth $12,000–$14,000/acre ($2,328,000–$2,716,000) before the rezoning and $600/acre ($116,400) afterward, a reduction of 95% or more. The City's appraiser testified that the property was worth only $4,000/acre ($776,000) before the rezoning and $2,500/acre ($485,000) afterward, a reduction of 37.5%. Although the trial court found after the bench trial that the rezon-

---

7. *See* Tex. Loc. Gov't Code § 212.009.

8. *See* 61 S.W.3d at 661 (Vance, J., concurring and dissenting).

ing had had "a severe economic impact on Sheffield", it did not quantify that impact. The jury found that the property was worth $970,000 ($5,000/acre) before rezoning and $485,000 ($2,500/acre) afterward, a reduction of 50%. In accordance with its findings and the jury's verdict, the trial court rendered judgment awarding Sheffield $485,000.

Both the City and Sheffield appealed. Sheffield argued that the moratorium also constituted a taking of its property, and that its claim for declaratory judgment should not have been dismissed. The City argued that neither the moratorium nor the rezoning was a taking of Sheffield's property.

Drawing from this Court's opinion in *Mayhew v. Town of Sunnyvale*,[9] the court of appeals stated that Sheffield could establish a compensable regulatory taking if the rezoning or moratorium either (1) did not substantially advance the City's legitimate interests,[10] (2) deprived Sheffield of all economically viable use of its property,[11] or (3) unreasonably interfered with Sheffield's use of the property[12] as measured by the severity of the economic impact on Sheffield and the extent to which its investment-backed expectations had been defeated.[13] The court held that the rezoning was not a taking under either of the first two tests. The court determined that rezoning Sheffield's property substantially advanced the City's legitimate interest in "protecting the community from the ill effects of urbanization" and "preserving the rate and character of community growth".[14] The court pointed to the City's

evidence that rezoning had reduced the estimated potential population of Stone Creek from 3,090 to 1,563, and that a less densely developed subdivision would mean "more open space and less traffic[,] ... greater setbacks, fewer school children, 'less folks, and less noise....' "[15] The court also held that rezoning did not deprive Sheffield of "all economically viable use" of its property,[16] based on Sheffield's admission that the property was still worth $600 acre.

But the court concluded that the rezoning unreasonably interfered with Sheffield's use of its property. The court believed that in determining the economic impact on Sheffield it could not consider the jury's finding in the trial on damages but could look only to the evidence offered in the bench trial on liability issues, even though that evidence was substantially the same as the evidence before the jury. The court reasoned that the minimum economic impact on Sheffield was a 38% reduction in the value of its property, based on testimony the City itself had offered, and concluded that such a reduction was "a sufficient adverse economic impact to satisfy the first factor of the unreasonable interference test."[17] The court then evaluated Sheffield's investment-backed expectations. The court noted that the PD 10 zoning was in place when Sheffield bought the property, that 43 acres of the original tract had already been developed under that zoning, that continued development was consistent with the City's 1995 comprehensive land use plan, and that before closing on the property Sheffield had at-

9. 964 S.W.2d 922 (Tex.1998).

10. 61 S.W.3d at 644, 645.

11. *Id.* at 644, 647.

12. *Id.* at 647.

13. *Id.* at 647–48.

14. *Id.* at 646.

15. *Id.*

16. *Id.* at 647.

17. *Id.* at 648.

tempted to confirm its development plans in several meetings with City officials.[18] The court also cited evidence that there was no existing market in Glenn Heights for larger homes and lots, that the highest and best use of the property was to hold it until such a market developed, and that Sheffield had lost anticipated profits of over $8 million.[19] The court noted that development under PD 10 zoning would not burden city services because the infrastructure for the development had long been in place.[20] The court recognized that no one fact could determine its inquiry, but concluded, based on all of the circumstances, that the rezoning "unreasonably interfered with Sheffield's investment-backed expectations."[21] Accordingly, the court held that the rezoning "unreasonably interfered with Sheffield's right to use and enjoy the property."[22]

Turning to the moratorium, the court disagreed with the trial court that the moratorium substantially advanced the City's legitimate interests for the entire period it was in effect.[23] The court noted that the City's stated purpose for the moratorium—to study whether PD 10 and other planned development areas should be rezoned—was completed when the City's consultant tendered his report and recommendations less than a month after the moratorium was first put in place.[24] Yet the moratorium was extended and re-extended a total of fifteen months (excluding the twelve-day gap found by the trial court). The court of appeals cited testimony by the Mayor and one Councilman that the moratorium was extended because of a stalemate on the Council and in order to pressure Sheffield into accepting the City's development conditions.[25] The Mayor testified that one Councilman "had expressed his concern that the City did not have enough leverage, as he likes to put it, over the developer".[26] From the evidence, the court concluded that "the motivation for the moratorium was never simply to study the zoning issue."[27] "[O]nce the city had all the information it needed to make a decision," the court concluded, "the stalemate on the council [over whether to reject the Planning and Zoning Commission's decision not to rezone PD 10 and four other PDs] was not a legitimate reason to continue the moratorium which prevented development of the property".[28] Thus, the court held that the moratorium was a compensable taking of Sheffield's property beginning with the Council's stalemate on April 21, 1997.[29]

Finally, the court also disagreed with the trial court's dismissal of Sheffield's claim for a declaratory judgment as not ripe. Rather, the court of appeals concluded, "nothing else ... can occur that will affect Sheffield's entitlement to a determination of" whether it had filed a plat vesting its development rights during a gap in the moratorium.[30] Accordingly, the court affirmed the judgment for damages for the rezoning and remanded the case

18. *Id.* at 650.

19. *Id.* at 650–51.

20. *Id.* at 651.

21. *Id.* at 652.

22. *Id.*

23. *Id.* at 657.

24. *Id.* at 655.

25. *Id.* at 655–56.

26. *Id.* at 656.

27. *Id.* at 657.

28. *Id.*

29. *Id.*

30. *Id.* at 658.

for a determination of damages for the moratorium and of Sheffield's claim for declaratory relief.[31] As the dissent noted, however, the court gave no guidance on whether Sheffield could "prevail on approval of the plat (thereby gaining the right to develop the property under the former zoning) *and* recover damages for the moratorium and re-zoning".[32]

We granted both parties' petitions for review.[33]

## II

We first consider Sheffield's claims that the rezoning and moratorium each effected a taking of its property without adequate compensation in violation of article I, section 17 of the Texas Constitution. Sheffield makes no claim under the Takings Clause of the Fifth Amendment to the United States Constitution, which is made applicable to the states through the Fourteenth Amendment.[34] The two guarantees, though comparable, are worded differently. The Texas Constitution provides

that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made. . . ."[35] The Takings Clause of the Fifth Amendment states: "nor shall private property be taken for public use without just compensation."[36] As the court of appeals noted, it could be argued that the differences in the wording of the two provisions are significant, but neither Sheffield nor the City makes this argument.[37] Both agree that in applying the Texas constitutional provision in this case, we should look to federal jurisprudence for guidance, as we have in the past,[38] and so we do.

## A

■ By their plain terms, the takings provisions of the state and federal constitutions do not limit the government's power to take private property for public use but instead require that a taking be compensated.[39] Physical possession is, categorically, a taking for which compensation

31. *Id.* at 660.

32. *Id.* at 661 (Vance, J., concurring and dissenting).

33. 45 Tex. Sup.Ct. J. 984 (July 3, 2002).

34. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 306 n. 1, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (citing *Chicago, B. & Q. R.R. Co. v. Chicago*, 166 U.S. 226, 239, 241, 17 S.Ct. 581, 41 L.Ed. 979 (1897)); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex.1998) (also citing *Chicago, B. & Q. R.R. Co.*).

35. Tex. Const. art. I, § 17.

36. U.S. Const. amend. V.

37. 61 S.W.3d at 642–44. *See DuPuy v. City of Waco*, 396 S.W.2d 103, 108 (Tex.1965) ("It was the injustice of requiring an actual [physical] taking which explains the inclusion for the first time in the Constitution of 1876 of the requirement that compensation be paid for the damaging of property for public use."); *Trinity & S. Ry. Co. v. Meadows*, 73 Tex. 32, 11 S.W. 145, 146 (1889) ("The insertion of the words 'damaged or destroyed' in [article I, section 17] was doubtless intended to obviate this question [of whether a compensable taking required a physical appropriation], and to afford protection to the owner of property, by allowing him compensation, when by the construction of a public work his property was directly damaged or destroyed, although no part of it was actually appropriated.").

38. *E.g., City of Austin v. Travis County Landfill Co.*, 73 S.W.3d 234, 238–39 (Tex.2002); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 932 (Tex.1982).

39. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ("As its language indicates, and as the Court has frequently noted, this provision does not prohibit the taking of private property, but instead places a condition on the exercise of that power.") (citations omitted).

is constitutionally mandated,[40] but a restriction in the permissible uses of property or a diminution in its value, resulting from regulatory action within the government's police power, may or may not be a compensable taking.[41] As we have said, "all property is held subject to the valid exercise of the police power" and thus not every regulation is a compensable taking, although some are.[42]

> There is ... no one test and no single sentence rule.... The need to adjust the conflicts between private ownership of property and the public's interests is a very old one which has produced no single solution.[43]

"Government hardly could go on", wrote Justice Holmes in the first regulatory takings case in the United States Supreme Court, "if to some extent values incident to property could not be diminished [by government regulation] without paying for every such change in the general law."[44] Yet, he continued, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."[45] "The general rule at least", he concluded, is "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking",[46] adding, "this is a question of degree—and therefore cannot be disposed of by general propositions."[47] "[T]he question at bottom is upon whom the loss of the changes desired *should* fall."[48]

While the United States Supreme Court has never questioned this rule since Justice Holmes stated it,[49] the Court has acknowledged that determining how far is "too far"

> has proved to be a problem of considerable difficulty. While this Court has recognized that the "Fifth Amendment's guarantee ... [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," this Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to

40. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner....").

41. *Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex.1994) ("An act short of actual physical invasion, appropriation, or occupation can amount to a compensable taking when a governmental agency has imposed restrictions that constitute an unreasonable interference with the landowner's right to use and enjoy the property.") (citation omitted).

42. *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984).

43. *Id.* (quoting *City of Austin v. Teague*, 570 S.W.2d 389, 392 (Tex.1978)).

44. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

45. *Id.* at 416, 43 S.Ct. 158.

46. *Id.* at 415, 43 S.Ct. 158.

47. *Id.* at 416, 43 S.Ct. 158.

48. *Id.* (emphasis added).

49. *See, e.g., First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 328, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ("There is no dispute about the proposition that a regulation which goes 'too far' must be deemed a taking.").

pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." [50]

As a result, the Supreme Court has admitted, "[c]ases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law." [51] For our part, we have called these legal battlefields "a 'sophistic Miltonian Serbonian Bog'". [52]

 There are small islands in the bog. The Supreme Court has identified, in its words, "at least two discrete categories of regulatory action as compensable without case-specific inquiry". [53] One is where regulation "compel[s] the property owner to suffer a physical 'invasion' of his property." [54] The direct, physical effect on property, though short of government possession, makes the regulation categorically a taking. Another is "where regulation denies all economically beneficial or productive use of land." [55] To deprive an owner of all economically beneficial use of land is tantamount to depriving him of the land itself. But this is "limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted'" [56] and "the landowner is left with a token interest." [57] In addition to these two situations, the Supreme Court has stated that regulation "effects a taking if [it] does not substantially advance legitimate state interests". [58]

 Otherwise, however, whether regulation has gone "too far" and become

**50.** *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (alteration in original) (citations omitted).

**51.** *Eastern Enters. v. Apfel,* 524 U.S. 498, 541, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

**52.** *City of Austin v. Teague,* 570 S.W.2d 389, 391 (Tex.1978) (quoting *Brazos River Auth. v. City of Graham,* 163 Tex. 167, 354 S.W.2d 99, 105 (1962)); *see also* John Milton, Paradise Lost 49, bk. II, ll. 592–94 (Scott Elledge ed., Norton & Co.1993)(1674)(describing the land beyond *Lethe* as "A gulf profound as that *Serbonian* bog / Betwixt *Damiata* and Mount *Casius* old, / Where armies whole have sunk").

**53.** *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

**54.** *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435–40, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)) (holding that "law requiring landlords to allow television cable companies to emplace cable facilities in their apartment buildings constituted a taking").

**55.** *Id.* at 1015–16, 112 S.Ct. 2886 (citing *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)); *see* also *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex.1998).

**56.** *Tahoe–Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (quoting *Lucas,* 505 U.S. at 1017–19, 112 S.Ct. 2886); *see also Mayhew,* 964 S.W.2d at 935. *But see Lucas,* 505 U.S. at 1016 n. 7, 112 S.Ct. 2886 ("Regrettably, the rhetorical force of our 'deprivation of all economically feasible use' rule is greater than its precision, since the rule does not make clear the 'property interest' against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole.").

**57.** *Palazzolo v. Rhode Island,* 533 U.S. 606, 631, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); *cf. Tahoe–Sierra,* 535 U.S. at 350, 122 S.Ct. 1465 (Rehnquist, C.J., dissenting) (arguing that economically beneficial use in *Lucas* is not synonymous with value).

**58.** *Agins,* 447 U.S. at 260, 100 S.Ct. 2138 (1980) (citation omitted); *see also Mayhew,* 964 S.W.2d at 933–34.

too much like a physical taking for which the constitution requires compensation requires a careful analysis of how the regulation affects the balance between the public's interest and that of private landowners. While each case must therefore turn on its facts, guiding considerations can be identified, as the Supreme Court first explained in *Penn Central Transportation Co. v. City of New York:*

> In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.[59]

The Supreme Court has restated these factors simply as:

(1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."[60]

Nevertheless, the Supreme Court has cautioned that these factors do not comprise a formulaic test. *"Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." "The temptation to adopt what amount to *per se* rules in either direction must be resisted."[61]

Thus, for example, the economic impact of a regulation may indicate a taking even if the landowner has not been deprived of all economically beneficial use of his property. Nor are the three *Penn Central* factors the only ones relevant in determining whether the burden of regulation ought "in all fairness and justice" to be borne by the public.[62] Whether a regulatory taking has occurred, the Supreme Court has said, "depend[s] on a complex of factors *including* " the three set out in *Penn Central.*[63] The analysis "necessarily requires a weighing of private and public interests"[64] and a "careful examination and weighing of all the relevant circumstances in this context."[65] As we have ourselves said of regulatory takings issues, "we consider all of the surrounding circumstances"[66] in ap-

**59.** 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (citations omitted).

**60.** *Connolly v. Pension Benefits Guar. Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (quoting *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. at 124, 98 S.Ct. 2646).

**61.** *Tahoe–Sierra,* 535 U.S. at 326–27 n. 23, 122 S.Ct. 1465 (citations omitted) (quoting *Palazzolo,* 533 U.S. at 634, 636, 121 S.Ct. 2448 (O'Connor, J., concurring)).

**62.** *See, e.g., City of Austin v. Teague,* 570 S.W.2d 389, 393 (Tex.1978) ("There is still another test which is sometimes helpful. It allows recovery of damages when the government's action against an economic interest of an owner is for its own advantage.").

**63.** *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448 (emphasis added).

**64.** *Agins v. City of Tiburon,* 447 U.S. 255, 261, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

**65.** *Tahoe–Sierra,* 535 U.S. at 326 n. 23, 122 S.Ct. 1465 (quoting *Palazzolo,* 533 U.S. at 636, 121 S.Ct. 2448 (O'Connor, J., concurring)).

**66.** *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex.1998).

plying "a fact-sensitive test of reasonableness".[67]

■ We have said that while determining whether a property regulation is unconstitutional requires the consideration of a number of factual issues, the ultimate question of whether a zoning ordinance constitutes a compensable taking or violates due process or equal protection is a question of law, not a question of fact. In resolving this legal issue, we consider all of the surrounding circumstances. While we depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law.[68]

We apply this standard to the record before us.

**B**

We come, then, to whether the rezoning of Sheffield's property was a taking. There was no physical invasion of the property, and Sheffield does not argue that it was deprived of all economically beneficial use of the property. Sheffield argues that the rezoning was a taking because it did not substantially advance the City's legitimate governmental interests, and because it went too far in restricting Sheffield's use and enjoyment of its property. We consider each argument in turn.

**1**

**a**

■ As a threshold matter, the City argues that a regulation should not be considered a taking merely because it does not substantially advance legitimate state interests. The United States Supreme Court flatly stated in *Agins v. City of Tiburon* that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests".[69] We agreed with that statement in *Mayhew v. Town of Sunnyvale* and used it in applying the takings provision in the Texas Constitution.[70] But the City argues that the Supreme Court has receded from its statement in *Agins,* and so should we in applying the Texas Constitution. Whether a regulation furthers a legitimate purpose, the City argues, is really a due process concern and not a test for determining whether the government must compensate a taking of property. Furthermore, the City argues, requiring compensation for a regulation merely because it does not advance state interests and therefore does not benefit the public, unfairly burdens taxpayers by requiring them to pay for something from which they did not benefit.

It is true, as the City says, that the Supreme Court appears to have equivocated somewhat on its statement in *Agins* outside the context of cases involving required dedications or exactions. In *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* the trial court had instructed the jury that a city's refusal to allow development of property would constitute a taking if "there was no reasonable relationship between the city's denial of the ... proposal and legitimate public purpose".[71]

**67.** *City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 804 (Tex.1984).

**68.** *Mayhew,* 964 S.W.2d at 932–33.

**69.** 447 U.S. at 260, 100 S.Ct. 2138 (citation omitted).

**70.** 964 S.W.2d at 933–34 (quoting Appendix at 304).

**71.** 526 U.S. 687, 701, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999).

The Court said that although it had never provided

a thorough explanation of the nature or applicability of the requirement that a regulation substantially advance legitimate public interests outside the context of required dedications or exactions, we note that the trial court's instructions are consistent with our previous general discussions of regulatory takings liability.[72]

"Consistent" does not, of course, equal correct, a fact made all the more noticeable by five Justices' expressly withholding opinion on whether *Agins'* substantial advancement requirement is a proper takings test.[73] But since *Del Monte Dunes*, the Supreme Court has cited the substantial advancement test without criticism,[74] as it had done several times earlier.[75]

■■■■ Whatever may be made of all of this, one thing is clear: the Supreme Court has never modified or retracted its statement in *Agins*. Prior decisions need not be reaffirmed periodically to retain authority. As the Supreme Court has admonished:

"[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [a lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." [76]

We are not, of course, bound to follow *Agins* in this case since Sheffield makes no claim under the United State Constitution, but as we have already said, we do look to federal takings cases for guidance in applying our own constitution. To that end, we conclude that *Agins* remains authoritative.

■■■■ Furthermore, apart from what the Supreme Court has said, we continue to believe for purposes of state constitutional law, as we held in *Mayhew*, that the statement in *Agins* is correct: that whether regulation substantially advances legitimate state interests is an appropriate test for a constitutionally compensable taking, at least in some situations. In this case, for example, Sheffield argues that the City did not rezone Stone Creek for any legitimate purpose, such as to avoid the ill effects of urbanization and provide for orderly development, but simply to muscle Sheffield into modifying its development proposals or going away altogether. If Sheffield were correct, we think the lack of a legitimate purpose alone would make the rezoning a taking, just as it would have in *Mayhew*. The City equates a lack of *legitimate* purpose with a lack of *public* pur-

72. *Id.* at 704, 119 S.Ct. 1624 (citation omitted).

73. *Id.* at 732 n. 2, 119 S.Ct. 1624 (Scalia, J., concurring in part and concurring in the judgment); *id.* at 753 n. 12, 119 S.Ct. 1624 (Souter, J., joined by O'Connor, Ginsburg, and Breyer, JJ., concurring in part and dissenting in part).

74. *Tahoe–Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323–24, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings context to regulatory takings claims.").

75. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) ("As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*'") (quoting (*Agins*, 447 U.S. at 260, 100 S.Ct. 2138) (alteration in the original) (citations omitted)).

76. *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

pose, the latter being a prerequisite to any taking.[77] Without a public purpose, the City reasons, there is no public benefit, and the public should not be required by the substantial advancement test to pay for government action from which it has received no benefit. But the flaw is in the equation. Government action may be for a public—as opposed to a private—purpose, even if that purpose is not a legitimate one for the government to engage in. For instance, as the Supreme Court has held, "the government may not require a person to give up a constitutional right … in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property."[78] Sheffield argues, not that the City's purposes were not public, but that they were not legitimate. If Sheffield is correct and the rezoning was therefore a taking, the benefit to the taxpayers would be that of the City's having achieved its goal.

Accordingly, we decline the City's invitation to reject the substantial advancement test for compensable takings stated in *Agins* and *Mayhew.*

### b

■ The trial court concluded that the rezoning of PD 10 substantially advanced a legitimate governmental purpose, and the court of appeals agreed. Sheffield argues that the assessment of the relationship between the City's actions and legitimate governmental purposes must be confined to the record of events, documents, and meetings leading up to the rezoning—the "legislative record"—and cannot consider, as the court of appeals did, *post hoc* arguments made by the City in the course of this litigation. Sheffield also argues that the court of appeals was too deferential to the City in assessing its purposes because the rezoning was not generally applicable but was aimed directly at Sheffield. Finally, Sheffield argues that by any standard, the rezoning was a taking under the substantial advancement test.

■ Sheffield cites no authority for its argument that the test must be limited to a "legislative record" of statements, positions, or findings by the City prior to the rezoning, and we have found none. While Sheffield correctly points out that the city commission in *Mayhew* gave reasons for its actions at the time they were taken,[79] we considered not only those reasons but evidence later offered in litigation.[80] For equal protection purposes, government action has a rational basis if one can be conceived, regardless of whether the government had it in mind when it took the action complained of.[81] Sheffield does not explain why the basis for takings analysis should be more constricted, and we know of no reason. The court of appeals did not err in looking to the City's evidence and arguments to assess its purposes.

■ Sheffield does not argue that the government must always be held to a heightened standard of judicial review when its purposes are assessed in a takings context, but only that a heightened

---

77. *Marrs v. R.R. Comm'n,* 142 Tex. 293, 177 S.W.2d 941, 949 (1944) (" 'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid' ") (quoting *Thompson v. Consol. Gas Co.,* 300 U.S. 55, 80, 57 S.Ct. 364, 81 L.Ed. 510 (1936)).

78. *Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

79. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex.1998).

80. *Id.*

81. *Owens Corning v. Carter,* 997 S.W.2d 560, 581 (Tex.1999).

standard is appropriate when the government has targeted a particular landowner or piece of property. As authority, Sheffield cites the Supreme Court's decision in *Nollan v. California Coastal Commission*, which held that conditioning a home rebuilding permit on the owners' conveyance of a public easement across their beachfront property was a compensable taking.[82] The Supreme Court explained:

> our cases describe the condition for abridgement of property rights through the police power as a *"substantial* advanc[ing]" of a legitimate state interest. We are inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective.[83]

We agree, but we read "particularly careful" to mean, not that an elevated standard of review must be applied, but that it ordinarily is, and should be, harder for the government to show that its interests have been substantially advanced by regulation directed at one lone landowner. Moreover, the record does not support Sheffield's argument that it was singled out. Eventually, the City's downzoning of residential property was virtually city-wide, affecting non-PD property and most of the PDs. It was certainly not restricted to PD 10. In determining whether the rezoning substantially advanced the City's legitimate purposes, the court of appeals was not, we think, unduly deferential.

▬▬▬ The court of appeals concluded that the City's rezoning substantially ad-

vanced its interests in avoiding the ill effects of urbanization and preserving the rate and character of community growth.[84] The court pointed to evidence that the downzoning would reduce the potential population and eventually result in more open space, less traffic, greater setbacks, and fewer school children, although the court also noted that roads, schools, and utilities had all been designed to accommodate original population estimates.[85] Sheffield argues that the most the evidence shows is that rezoning could *theoretically* advance the City's legitimate purposes, and that is not enough. We agree that the substantial advancement requirement must be, in the Supreme Court's words, "more than a pleading requirement, and compliance with it . . . more than an exercise in cleverness and imagination."[86] But we do not think it must be proved to a certainty. Indeed, the actual effects of the City's rezoning are for the future and can only be projected and estimated. The City offered evidence that rezoning the PDs would lower its potential population by about 6,000, from about 31,000 to 25,000, and that rezoning PD 10 accounted for about one-fourth of this reduction. The City could reasonably conclude that this would substantially advance its legitimate interest in preserving a smaller community environment. Also, the City's concern with its growth first arose in 1995 and thus was not prompted by Sheffield's acquisition of Stone Creek, even though Sheffield's imminent development plans clearly stirred the City's anxiety. Thus, while the evidence establishes that from the fall of 1996 on, the City had its eye on Sheffield all during the rezoning efforts, the Stone Creek subdivision was not the City's only

---

82. 483 U.S. 825, 839, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

83. *Id.* at 841, 107 S.Ct. 3141 (alteration in the original).

84. 61 S.W.3d at 646.

85. *Id.*

86. *Nollan*, 483 U.S. at 841, 107 S.Ct. 3141.

focus, and its efforts were not so narrowly directed at Sheffield alone as to indicate that the City's legitimate interests in controlled growth had taken a back seat.

On balance, we agree with the lower courts that the City's rezoning substantially advanced legitimate government interests.

### 2

Even so, we must consider whether the City went so far in restricting Sheffield's use of its property that the rezoning was more like a taking and "in all fairness and justice", the burden of that restriction should be borne by the public. We begin with the three *Penn Central* factors, mindful as we do that our analysis cannot be merely mathematical.

First, as the lower courts concluded, the rezoning clearly had a severe economic impact on Sheffield. By the City's own evidence, the rezoning reduced the value of Sheffield's property by 37.5%, below what it was when Sheffield purchased it, although not below the bargain price Sheffield paid. The jury found that the value of the property had been reduced by half, but that it was still worth more than four times what Sheffield paid for it. From Sheffield's perspective as a developer, the economic impact of the rezoning included more than $8 million in lost profits from the planned development. There was no existing market for the larger lots required by the rezoning, and the evidence was disputed whether one would ever develop. The City argues that evidence of lost profits should be ignored, but we agree with the court of appeals that lost profits are clearly one relevant factor to consider in assessing the value of prop-

erty and the severity of the economic impact of rezoning on a landowner. It must be kept in mind, however, that

> [t]he takings clause ... does not charge the government with guaranteeing the profitability of every piece of land subject to its authority. Purchasing and developing real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause.[87]

But while the impact of rezoning on Sheffield was unquestionably severe, it did not approach a taking. The court of appeals focused on the diminution in the value of Sheffield's property, nearly 38% by the testimony of the City's expert. We think the relevant number is 50%, as found by the jury. But diminution in value is not the only, or in this case even the principal, element to be considered. It is more important that, according to the jury verdict, the property was still worth four times what it cost, despite the rezoning, because this makes the impact of the rezoning very unlike a taking. Sheffield argues that its business acumen or good fortune in acquiring the property cannot be considered in assessing the economic impact of rezoning, but we think that investment profits, like lost development profits, must be included in the analysis.

Second, again as the lower courts concluded, the rezoning significantly interfered with Sheffield's reasonable, investment-backed expectations. Sheffield's expectations were certainly reasonable. The PD 10 zoning had been in place for ten years before Sheffield acquired the property, and part of the subdivision had already been developed under that zoning scheme consistent with the City's comprehensive land use plan.[88] More-

87. *Taub v. City of Deer Park,* 882 S.W.2d 824, 826 (Tex.1994).

88. *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 936 (Tex.1998) ("Knowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations.").

over, Sheffield's expectations were not merely those of any landowner, or even those of any developer; rather, Sheffield's expectations were based in large part, and legitimately so, on its efforts to deal with the City. Sheffield met with city officials to present his plans for development and inquire about any contemplated zoning changes, and as the trial court found, its reliance on representations made in those meetings was in good faith. Although no City employee ever promised Sheffield that there would be no change in zoning (nor would any such promise have bound the City [89]), it is fair to say that the moratorium and rezoning blindsided Sheffield, just as the City intended. Evidence of Sheffield's dealings with the City is not, as the City argues, an improper basis to estop the City, but proof of the reasonableness of Sheffield's expectations. However, it must also be said that the investment backing Sheffield's expectations at the time of rezoning—the $600/acre purchase price and the expenses of exploring development with the City—was minimal, a small fraction of the investment that would be required for full development. And as with most development property,

Sheffield's investment was also speculative,[90] as evidenced by the fact that the property Sheffield acquired had not been developed in the ten years since it was first zoned PD 10.

Third, the rezoning, as we have already explained, was general in character and not exclusively directed at Sheffield. This case is not like *Nollan,* for example, where an easement was exacted from a single landowner for a rebuilding permit. Zoning changes are to be expected, especially in growing communities like Glenn Heights. The rezoning here was typical of such changes.

Beyond the three *Penn Central* factors, we are concerned, as we have already indicated, about the City's conduct. The evidence is quite strong that the City attempted to take unfair advantage of Sheffield, and quite lacking in any indication of unfair action on Sheffield's part. The City, fearful that we might consider the improvident statements of individual officials and employees, argues that the actions and motives of those individuals are not those of the City itself. Of course, we agree.[91] But it is exactly the City's conduct, not that of its officials

---

89. *See, e.g., City of Pharr v. Pena,* 853 S.W.2d 56, 62 (Tex.App.-Corpus Christi 1993, writ denied) ("statements or assurances regarding zoning made by individual members of the city council, board or commission are not binding and do not give private property owners a vested right to the use or disposal of their property so as to deny the city the exercise of its police power"); *Alamo Carriage Serv., Inc. v. City of San Antonio,* 768 S.W.2d 937, 941–42 (Tex.App.-San Antonio 1989, no writ) ("Statements of individual council members are not binding on the City."); *City of Farmers Branch v. Hawnco, Inc.,* 435 S.W.2d 288, 292 (Tex.Civ.App.-Dallas 1968, writ ref'd n.r.e.) ("[assurances regarding continued zoning] by individual members of a council or board are not binding on a governmental body which may act only in its official capacity").

90. *See Taub,* 882 S.W.2d at 826.

91. *See, e.g., City of Corpus Christi v. Bayfront Assocs., Ltd.,* 814 S.W.2d 98, 105 (Tex.App.-Corpus Christi 1991, writ denied) ("an individual city council member's mental process, subjective knowledge, or motive is irrelevant to a legislative act of the city, such as the passage of an ordinance"); *Mayhew v. Town of Sunnyvale,* 774 S.W.2d 284, 298 (Tex.App.-Dallas 1989, writ denied) ("the subjective knowledge, motive, or mental process of an individual legislator is irrelevant to a determination of the validity of a legislative act because the legislative act expresses the *collective will* of the legislative body") (quoting *Sosa v. City of Corpus Christi,* 739 S.W.2d 397, 405 (Tex.App.-Corpus Christi 1987, no writ)), *aff'd after remand,* 964 S.W.2d 922 (Tex.1998).

and employees, that is so troubling. The City did not rezone or impose a moratorium on development, or indicate that it had the remotest intention of doing so, until Sheffield closed on the purchase of the property. The moratorium it imposed was for the purpose of "study", which was unquestionably completed within a month. Yet for a year the City Council delayed action on the Planning and Zoning Commission's decision that PD 10 not be rezoned. According to the City's own records, a reason for the delay was to muster the votes to reject the Commission's decision. On the other hand, the City Council continued to consider the zoning of many other PDs during the same time period, suggesting that the delay was lethargic rather than ill-motivated. And while the City's conduct is troubling, it must also be said that the benefits the City legitimately sought to achieve from rezoning were not thereby diminished.

Taking all of these factors into account, the trial court concluded that the rezoning was not unreasonable, and a divided court of appeals disagreed. We agree with the court of appeals that the downzoning in this case is much different from the refusal to upzone in *Mayhew*, thereby maintaining the *status quo* and preventing the landowner from proceeding with an enormous development on land that had long been used solely for agricultural purposes in a small, uniquely rural environment. Nevertheless, we do not agree that the rezoning in this case went too far, approaching a taking. Rather, we think that the City's zoning decisions, apart from the faulty way they were reached, were not materially different from zoning decisions made by cities every day.[92] On balance, we conclude that the rezoning was not a taking.

## C

■ We now turn to whether the fifteen-month moratorium preceding the rezoning was a taking.

### 1

We first consider whether the moratorium substantially advanced legitimate government interests. Sheffield does not argue that the moratorium should never have been imposed. Rather, Sheffield would hold the City to its own words. The moratorium, according to the City, was

solely for the purpose of allowing the City Council to study, in conjunction with the City's planning and administrative officials, the zoning, growth and development related issues and concerns presented by the nonconformity of the City's planned developments with the City's Code and Future Land Use Plan.

After April 21, 1997, Sheffield argues, there was nothing left "to study". The consultant's report was complete, the Planning and Zoning Commission had reviewed it, the issues were drawn, and it was time for decision. At its meeting on that date, Sheffield argues, the City Council could have taken up the Commission's decision to reject the consultant's recommendation that PD 10 not be rezoned, and could have accepted or rejected it, but did neither because of a stalemate among councilmembers. Furthermore, there is evidence that at least one councilmember wanted to use delay to give the City more leverage in pressuring Sheffield to agree to a less dense development plan.

---

92. *See Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) ("It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in the legitimate exercise of its police powers . . . .").

Again, we agree with the City that evidence of one official's motives cannot be attributed to the City itself. We look entirely to the objective evidence regarding the City's actions. The City argues, candidly but remarkably, that using delay to extract concessions from landowners is a legitimate government function. We disagree,[93] and were we convinced that this was the sole reason for the City's delay, we would be required to consider whether the moratorium constituted a compensable taking. Delay may be necessary or appropriate to allow everyone affected by a zoning decision an opportunity to fully consider all options and negotiate solutions, but the use of delay for extortion is hardly a legitimate government function. The City also contends that we cannot second-guess its motives and must presume that the extended moratorium was due to nothing other than an honest disagreement over the appropriate zoning for the planned development areas. But the takings provision of the Texas Constitution would suffer a huge loophole if we were required to presume that a city's endless refusal to permit a landowner the reasonable use of his property was justified by an honest disagreement of councilmembers.

The fact is that during eight months of the moratorium, the City rezoned seven PDs. It took time. There is no evidence that the City meant to unfairly pressure all of the affected landowners. On the contrary, the evidence reflects an orderly, albeit slow, process toward resolving the differences between the City Council, the Planning and Zoning Commission, and the City's consultant. One can wish that the process had hurried along, but we cannot say that the moratorium did not substantially advance a legitimate governmental purpose.

### 2

Nor can we say that the moratorium went too far towards a taking. Sheffield did not show during the liability trial, as it was required to do, what economic impact it suffered from the moratorium as distinct from the rezoning. Nor does the record show how Sheffield's reasonable, investment-backed expectations excluded the possibility of a fifteen-month delay in a decision on its development plans. No other aspects of the moratorium make it more like a temporary taking—that is, an unreasonable prohibition in the use of property for a defined period[94]—than a mere delay in decision. We can easily imagine circumstances in which delay was aimed more at one person, or was more protracted with less justification, and more indicative of a taking. But the evidence in this case does not approach that situation.

### III

Having failed to find that the City's rezoning was a compensable taking of Sheffield's property, we are left with one issue: whether Sheffield's vested rights claim was ripe. Sheffield claims that the plat it filed on March 11, 1997, vested its development rights because the moratorium was not then in effect and the City did not act on the filing. We agree with the court of appeals that this claim was ripe. The City argues that the parties did not argue ripeness to the trial court, but that does not lessen the fact that ripe-

---

93. *Cf. Westgate, Ltd. v. State*, 843 S.W.2d 448, 454 (Tex.1992) ("The policy reasons that support our decision today [that delaying condemnation of property after announcement of an intent to do so is not a taking] might not be applicable where the condemning authority is accused of intentionally injuring a landowner.").

94. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

ness was the basis for the trial court's ruling. As the court of appeals concluded, there was nothing to prevent the trial court from ruling on the merits of Sheffield's claim.

The concern expressed in the dissent in the court of appeals that Sheffield might *both* recover damages for restrictions on the development of its property *and* nevertheless be permitted to develop its property unimpaired by those restrictions [95] is no longer real, since we have held that Sheffield cannot recover damages. However, another issue remains: has Sheffield's pursuit of damages foreclosed its claim that it is entitled to develop its property under PD 10 zoning because of a properly submitted plat during a hiatus in the moratorium, as found by the trial court. While this action has been pending, Sheffield sued the City, asserting that its development rights were statutorily fixed by the original Stone Creek plat in 1986. The court of appeals held in that case that the action for damages now before us was an election of remedies, foreclosing Sheffield's claim, *because* Sheffield did not assert that claim in this action before judgment.[96] But Sheffield's claim for declaratory relief in the present action is on a different footing. Sheffield did assert in this action, before judgment, that its development rights were fixed, not by the originally filed plat, but by a plat submitted to the City during what the trial court found was a hiatus in the moratorium due to the City Council's failure to extend it. The election issue is therefore different. It has not been briefed or argued, and we express no opinion on it.

Since the sole question before us is whether the vested rights issue is ripe for decision, and we agree with the court of appeals that it is, we remand the issue to the trial court for further proceedings.

\* \* \* \* \* \*

Accordingly, we reverse the judgment of the court of appeals on Sheffield's takings claims and render judgment that Sheffield take nothing against the City, and we affirm the judgment of the court of appeals remanding Sheffield's claim for a declaration that its development rights have been vested by its plat submitted March 11, 1997.

---

**95.** 61 S.W.3d at 661 (Vance, J., concurring and dissenting).

**96.** *City of Glenn Heights v. Sheffield Dev. Co.,* 55 S.W.3d 158 (Tex.App.-Dallas 2001, pet. denied).