# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00790-CV

**2800 La Frontera No. 1A, Ltd.; 2800 La Frontera No. 2A, Ltd.; 941 Hester's Crossing No. 1A, Ltd.; 941 Hester's Crossing No. 2A, Ltd.; and 941 Hester's Crossing No. 3A, Ltd., Appellants**

**v.**

**City of Round Rock, Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
NO. 07-175-C368, HONORABLE BURT CARNES, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellants (collectively "the Owners") own apartment buildings in the La Frontera development in Round Rock. After the City of Round Rock re-zoned adjacent land, the Owners sued the City, alleging that the re-zoning had reduced the value of their property. The trial court granted the City's motion for summary judgment. On appeal, the Owners assert that there are genuine issues of material fact on each of their causes of action and, therefore, that summary judgment was improper. We will affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1999, the City created Planned Unit Development No. 39 ("PUD 39") on the application of a developer named "35/45" (the "La Frontera Developer").[1] PUD 39 is better known as La Frontera, a mixed-use development consisting of multifamily housing, shopping centers, and office buildings situated at the northwest corner of the intersection of IH-35 and state highway 45. When PUD 39 was created, the La Frontera Developer, which owned the entire 194-acre tract, entered into an "agreement and development plan" with the City. The Owners claim that the agreement specified that amendments, changes, or modifications to PUD 39 could not be made without the approval of everyone who owned real property within the PUD at the time the amendment was proposed.[2] The original plan for PUD 39 allowed a maximum of 900 apartment units to be built on the site. Two apartment complexes, the Enclave Apartments and Lakeside Apartments, were built within PUD 39, containing a total of 777 units. Thus, when the Owners

---

[1] A PUD is "[a] land area zoned for a single-community subdivision with flexible restrictions on residential, commercial, and public uses." Black's Law Dictionary 1268 (9th ed. 2009). "A PUD is primarily an alternative to traditional zoning since it provides a mixing of uses. The location and identification of the permitted uses are provided on the PUD map or plat, which closely resembles a subdivision plat. Development approval is generally granted for the PUD at one time rather than on a lot by lot basis and in that way closely tracks the subdivision approval process." *Id.* (quoting Juergensmeyer & Roberts, *Land Use Planning and Development Regulation Law* § 7.15, at 288 (2003)).

[2] We note that the Owners' brief actually asserts that "[t]he Agreement and Development Plan for PUD 39 does not provide that amendments, changes or modification of PUD 39 can be made with the approval of less than 100% of the owners of the real property which comprises PUD 39." (Emphasis in original.) This, of course, is different from saying that amending the PUD affirmatively *requires* the consent of all current landowners. The text of the agreement itself merely states that "[m]ajor changes to this Agreement or the Development Plan must be resubmitted following the same procedure required by the original PUD application." It is not clear from the present record exactly what that procedure was.

2

bought the complexes, they assumed that only 123 additional multi-family units could be built in the PUD. Because they thought that a 123-unit apartment complex would be too small to be commercially viable, and because they believed that the City would need their consent to allow additional multi-family units in PUD 39, the Owners assumed that they effectively had 123 additional units in reserve for future expansion.

In April 2006, the La Frontera Developer and other property owners in PUD 39 submitted an application to amend the PUD to increase the total number of multifamily units allowed. The City asked the Owners for their consent to the amendment, pursuant to the parties' understanding of the agreement and development plan. The Owners refused, and the amendment failed. In what the Owners claim was an "end around" the consent requirements for amending PUD 39, the La Frontera Developer later filed applications to create two new PUDs out of land within the boundaries of PUD 39. After holding public meetings, the City passed ordinances creating PUD 70, a 9.04-acre tract zoned for 360 additional multi-family units, and PUD 72, a 17.889-acre tract.

After creation of the new PUDs, the Owners sued the City, asserting claims of inverse condemnation, spot zoning, declaratory judgment, promissory estoppel, and a violation of substantive due process. The district court granted the City's motion for summary judgment, dismissing all of the Owners' causes of action with prejudice. The Owners appeal, asserting the existence of genuine issues of material fact.

## STANDARD OF REVIEW

Whether a summary judgment is proper is a question of law that we review de novo. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). A movant is entitled to summary judgment if (1) there are no genuine issues of material fact, and (2) it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). "[S]ummary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense." *Sci Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997) (citations omitted). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215-16 (Tex. 2003).

## DISCUSSION

### Validity of PUD 39's Agreement Provision

Before we analyze the Owners' other issues on appeal, we first address whether the City is bound by the owner-consent provision of the PUD 39 agreement and development plan.[3] We address this issue first because the Owners request declaratory relief on it and because the effect of the provision underlies many of the Owners' arguments.

---

[3] As noted in footnote 2 *supra*, the plain language of the agreement does not actually require unanimous consent for amendment. The City does not, however, directly contest the Owners' interpretation of that provision. Accordingly, we will assume, for purposes of this appeal, that the Owners' interpretation is correct.

The City asserts that the Owners' claims concerning the agreement amount to impermissible "contract zoning," which occurs when a governmental entity agrees to zone land in a certain way in exchange for a landowner's agreement to use the land in a certain way. *See City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 772 n.2 (Tex. 2006). The City claims that it cannot cede its police power, including its authority to make zoning changes, by agreement.

Zoning is a legislative function that the City cannot cede. *City of Bellaire v. Lamkin*, 317 S.W.2d 43, 45 (Tex. 1958); *Super Wash, Inc. v. City of White Settlement*, 131 S.W.3d 249, 257 (Tex. App.—Fort Worth 2004), *rev'd on other grounds*, 198 S.W.3d 770 (Tex. 2006). Therefore, a city cannot "surrender its authority to determine proper land use by contract." *Super Wash, Inc.*, 131 S.W.3d at 257. Zoning decisions must occur via the legislative process and not by "special arrangement" with a property owner. *Id.* (citing *City of Arlington v. City of Fort Worth*, 844 S.W.2d 875, 878 (Tex. App.—Fort Worth 1992, writ denied)).

The Owners contend that they "do not assert the City is contractually bound to the development and zoning plan embodied in the PUD 39 Agreement in perpetuity." Rather, the Owners argue that "the City was bound to follow the procedures it established for approving *major changes* to PUD 39. One of the procedures is obtaining the consent of all landowners within PUD 39." In other words, the Owners assert that, in exchange for the La Frontera's Developer's agreement to use the land as specified in the development plan, the City has established a procedure that requires it to obtain consent from all of the property owners in PUD 39 before performing one of its legislative functions. We find this distinction unconvincing. Labeling this requirement as a "procedure" does not change the fact that the City would be "surrender[ing] its authority to

5

determine proper land use by contract." *See Super Wash, Inc.*, 131 S.W.3d at 257. Such a requirement, whether substantive or procedural, is unenforceable. Insofar as any of the Owners' claims for relief rely on the enforceability of the consent provision of the development plan, they must fail.

We will now address the Owners' points of error.

**Inverse Condemnation**

The Owners sued the City for inverse condemnation, alleging that the creation of PUDs 70 and 72 constituted a regulatory taking under article I, section 17 of the Texas Constitution.[4] *See* Tex. Const. art. I, § 17 (no private property may be taken, damaged, destroyed, or applied to public use without just compensation). In an inverse condemnation suit, a property owner alleges that a taking has already occurred and requests just compensation from the government. The general elements of an inverse condemnation case are: "(1) an intentional act of a government entity; (2) accomplished for a public purpose; (3) that damages or takes property from a private citizen." *Domel v. City of Georgetown*, 6 S.W.3d 349, 357 (Tex. App.—Austin 1999, pet. denied).

---

[4] Although the Owners make no claim under the Fifth Amendment of the United States Constitution, Texas courts consider federal jurisprudence when reviewing takings claims under the Texas Constitution, even though the two takings clauses are not identical. *See, e.g.*, *Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 56 (Tex. 2006); *Sheffield Dev. Co. v. City of Elgin Heights*, 140 S.W.3d 660, 669 (Tex. 2004); *City of Austin v. Travis County Landfill Co.*, 73 S.W.3d 234, 238-39 (Tex. 2002); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 932 (Tex. 1982).

*(i) The* Penn Central *Takings Test*

In a regulatory-taking suit, a property owner alleges that a governmental regulation affects his or her property in a way that amounts to a taking. For a regulatory taking to occur, a governmental regulation must, at a minimum, diminish the value of an owner's property. *Sheffield Dev. Co. v. City of Elgin Heights*, 140 S.W.3d 660, 670 (Tex. 2004). Not every regulation that diminishes the value of property, however, is a taking. *Id.*

There is no universal test to determine whether a regulation constitutes a taking. *Id.* The United States Supreme Court has held that a regulation rises to the level of a taking when it goes "too far." *Id.* (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). What qualifies as "too far" varies by situation. At least two situations are clear-cut: physical invasions of property and regulations that strip away all economically beneficial uses of land are takings per se. *Id.* at 671. In this case, the Owners do not claim that their property was physically invaded or that the City's zoning regulations eliminated all the economically beneficial uses of their property.

In cases like the present one, we decide whether a regulation is a taking by applying a careful analysis to balance the interests of private property owners and the public. *Sheffield Dev. Co.*, 140 S.W.3d at 671-72. We are to conduct this "ad hoc, factual inquir[y]" using the following guiding factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action. *Id.* at 672. In addition to these "*Penn Central*" factors,[5]

---

[5] These factors were first enunciated by the Supreme Court in *Penn Central Transport Co. v. New York City*, 438 U.S. 104, 124 (1978).

7

we should consider all relevant attendant circumstances as well. *Hallco Tex., Inc v. McMullen County,* 221 S.W.3d 50, 56 (Tex. 2006).

Our goal is to determine, after analyzing and balancing all relevant evidence, whether fairness and justice demand that the burden of the regulation be borne by the public or by the private landowner. *Sheffield Dev. Co.*, 140 S.W.3d at 672. It is possible, however, that "the force of one of the *Penn Central* factors may be so overwhelming that it is dispositive of whether a taking has occurred." *Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 569 (Tex. App.—Tyler 2007, pet. denied) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)). Our "touchstone" is to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005). Our inquiry "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Id.* Our analysis must not be merely mathematical. *Sheffield Dev. Co.*, 140 S.W.3d at 677. Rather, while applying the balancing test, we must remember that "[p]urchasing and developing real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause." *Id.* at 677.

Whether a zoning ordinance is a taking is a matter of law for the court to decide. *Id.* at 673. "While we depend on the district court to resolve disputed facts regarding the extent of governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *Mayhew*, 964 S.W.2d at 932-33. Stated another way, "[t]he extent of the governmental intrusion may be a question for the trier of fact, but whether the

8

facts constitute a taking is a question of law." *Hallco Tex., Inc.*, 221 S.W.3d at 56 (citing *Sheffield Dev. Co.*, 140 S.W.3d at 673).

The Owners claim that summary judgment was improper because their taking claim turns on the following fact issues: (1) "whether the City acted to its own advantage to curry favor with developers and in disregard of Appellants' economic interests, reasonable investment-backed expectations and use and enjoyment of their property;" (2) whether the City created PUDs 70 and 72 solely to promote the interests of the developer; and (3) whether the City should have conducted a traffic-impact analysis, and whether its failure to do so renders the City's decision arbitrary and capricious.

In analyzing whether the City was entitled to summary judgment, "we take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor." *Provident Life & Acc. Ins. Co.*, 128 S.W.3d at 215-16. In our analysis, we examine the Owners' factual allegations in light of the takings test and determine whether, if proved at trial, they would amount to a taking as a matter of law. If we determine that they would not, then summary judgment for the City was appropriate; if, however, we determine that they would, then we must remand the case for a determination of the disputed fact issues. We begin our analysis with the *Penn Central* factors, and then consider other relevant evidence. *See Sheffield Dev. Co.*, 140 S.W.3d at 672.

*(1) Economic Impact on the Owners*

The first *Penn Central* factor, the regulation's economic impact on the claimant, is undisputed for the purpose of this appeal. The Owners presented expert testimony that the value of their properties was reduced from $65.6 million to $62.9 million. The City's expert testimony suggested a smaller diminution in value, but the City stipulated to the Owners' figure for the purposes of this appeal. While significant in absolute terms, this diminution in value of $2.7 million reflects a loss of only about 4%. The City cites several cases that suggest such a small diminution in value is rarely if ever held to be a taking. The City claims that because the Owners' loss was a small part of their property's value, they "failed to show that the Zoning Changes unreasonably interfered with their use of the property." While it is possible that this one factor could be dispositive, *see Canal Ins. Co.*, 238 S.W.3d at 569, it is not necessary that we hold it be so in this case. The City is correct, however, when it asserts that the magnitude of the Owners' loss weighs heavily against their claims. *See Lingle*, 544 U.S. at 539 ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.").

*(2) Interference with Reasonable Investment-Backed Expectations*

The second *Penn Central* factor requires us to consider the extent to which the regulation has interfered with the Owners' reasonable investment-backed expectations. Insofar as the Owners' investment-backed expectations included the belief that the City could not alter the zoning of any property in PUD 39 without their agreement, we have already explained why those expectations were not reasonable. The Owners admit that their expectations stem primarily from

their reliance on the PUD 39 agreement and development plan. They also assert that they relied on the "PUD zoning structure" to insulate them from "arbitrary" zoning changes. The Owners appear to argue that because their land was within a PUD—a comprehensive "subdivision-like" zoning plan—the City had a heightened duty when amending the PUD or otherwise re-zoning the land within it. It is well settled in Texas, however, that "property owners do not acquire a constitutionally protected vested right . . . in zoning classifications once made." *City of University Park v. Benners*, 486 S.W.2d 773, 778 (Tex. 1972). The City retains its legislative authority to re-zone at any time as public necessity demands. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981). The Owners have not convinced us that there is sufficient justification, for the purposes of this analysis, to treat the Owners' reliance on zoning classifications in a PUD differently from any property owner's reliance on more conventional zoning classifications. We find it telling that the Owners admit that the City has the same power to amend a PUD—or to create a new PUD out of an old one—as it does to re-zone in general. We are unpersuaded by the Owners' attempt to distinguish a PUD from "classic" zoning.

This, of course, does not defeat the Owners' taking claim. The Owners are alleging a taking because the City's regulation diminished the value of their property by interfering with their reasonable investment-backed expectations, not because they have a "vested interest" in a zoning classification. Yet, the Owners assert that because their land was in a PUD they were "insulated" from zoning changes to a greater degree than if it was not. This belief presumably formed part of their investment-backed expectations. For the reasons stated above, however, the Owners'

11

reasonable investment-backed expectations are no greater than any other land owner subject to "conventional" municipal zoning.[6]

Keeping this in mind, we find that the ordinances at issue here caused minimal interference with the Owners' *reasonable* investment-backed expectations. The Owners concede that the only harm they have suffered is increased competition and a resulting diminution in the value of their property. The City has not re-zoned the Owners' property to prohibit a current or proposed use, nor has the City substantially altered the character of the surrounding land use. The City simply increased the number of multifamily units permitted within the original boundaries of PUD 39, which already included a significant number of multifamily units. As the Texas Supreme Court noted in *Mayhew*, the "existing and permitted uses of the property constitute the 'primary expectation' of the landowner that is affected by regulation." 964 S.W.2d at 936. In creating

---

[6] The City asserts that the Owners' taking claim fails as a matter of law because the Owners cannot have a vested property right in a zoning classification, citing *Watergate E. Comm. Against Hotel Conversion v. District of Columbia Zoning Comm'n*, 953 A.2d 1036 (D.C. 2008). In *Watergate East*, the court of appeals for the D.C. Circuit held that the claimants had no vested rights in an existing zoning classification of the Watergate Hotel and therefore could not recover on a taking claim. *Id.* at 1046. The Owners argue that *Watergate East* is inapplicable to this case because, unlike the claimants in *Watergate East*, the Owners do not argue that they have vested rights in a specific zoning classification, only that they have a reasonable investment-backed expectations with which the City interfered when it passed the re-zoning regulations. We note that in *Watergate East* there is no indication that the claimants raised a "*Penn Central*" regulatory-taking claim by alleging interference with their investment-backed expectations; rather, they based their taking claim on the existence of a "'vested interest' in the current balance of uses within the PUD," which we take to be different from claimants' reasonable investment-backed expectations with respect to the then-existing zoning classifications. *Id.* Accordingly, *Watergate East* does not control here, as changes in zoning ordinances based on interference with reasonable investment-backed expectations often form the basis of regulatory-taking claim. *See, e.g., Sheffield Dev. Co.*, 140 S.W.3d at 663; *Mayhew*, 964 S.W.2d at 925.

PUDs 70 and 72, the City has not altered the existing or permitted uses of the Owners' property and therefore has not interfered with the "primary expectation" of the Owners.

### (3) Character of the Governmental Action

The third *Penn Central* factor is the character of the governmental action. This factor is the least concrete, and also appears to carry the least weight. *See Lingle*, 544 U.S. at 539 ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."). This factor's purpose, when viewed in light of the goal of the takings test—to determine if the constitution requires the burden of the regulation to be borne by the public or the landowner—is to elicit consideration of whether a regulation disproportionately harms a particular property. *See Sheffield Dev. Co.*, 140 S.W.3d at 678 (factor includes consideration of whether "the rezoning . . . was general in character and not exclusively directed at" claimant). If the re-zoning was general in character, that weighs against the property owner, whereas if the re-zoning impacted the claimant's property disproportionately harshly, that weighs in the owner's favor.

The Owners assert that the governmental action in this case targeted two small subsections of an otherwise-cohesive PUD, thereby increasing competition for their apartment businesses. The Owners also assert that because a PUD is a cohesive unit of development, it should be partitioned infrequently and only to meet important public needs. They claim that the City amended PUD 39 solely to satisfy the La Frontera Developer. The Owners cite as evidence for this contention the fact that the City failed to conduct a traffic-impact analysis or otherwise analyze the impact on PUD 39 of adding multifamily units. The City responds by citing language from city

13

ordinances and public meeting minutes that suggests the new PUDs were crafted to "create a more modern pedestrian-friendly and urban environment." The City also cites evidence that "the City staff supported the changes as beneficial and appropriate improvements to the existing development standards of the PUD." The Owners dismiss this evidence, which is contained in the public meeting minutes, as self-serving and not reflective of the true nature of the City's conduct. They assert that the City invented the pedestrian-friendly-urban-environment explanation as a pretext to justify the new PUDs after it realized that the Owners might sue. In support of this argument, the Owners claim that the changes in the ordinance creating PUD 72 have nothing to do with creating an "urban environment," and no modifications were made to PUD 70 at all except to excise the land from PUD 39.

The Owners' fact questions relate to this third *Penn Central* factor as well as the circumstances of the ordinance's enactment, so we will address them now. All three questions are part and parcel of the same essential inquiry: whether the City created PUDs 70 and 72 for the public welfare or did so to benefit the private interests of the La Frontera Developer. The Owners presented evidence that could lead a reasonable fact-finder to conclude that one of the City's purposes, or perhaps even its primary purpose, for enacting the ordinances was to benefit the La Frontera Developer. That evidence does not preclude summary judgment for the City, however, because the other two *Penn Central* factors—particularly the first—weigh so heavily against the Owners that, as a matter of law, there is no taking here.

The ordinances in this case simply do not go "too far" such that fairness and justice require their cost to be borne by the public. The relative diminution in value of the Owners' property

14

is very small. The degree of interference with their reasonable investment-backed expectations is modest, as the City's re-zoning merely allowed increased competition and did not prohibit any current or future use of their property. The ordinances were also not specifically targeted at the Owners, particularly given that "[z]oning changes are to be expected, especially in growing communities." *Sheffield Dev. Co.*, 140 S.W.3d at 678. With respect to the attendant circumstances, even assuming the City's primary motivation was to assist the La Frontera Developer, the first two *Penn Central* factors weigh too heavily against the Owners' claims. In sum, this case is not one in which the "regulatory actions [] are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539.

#### (ii) The "Substantial Advancement" Takings Test

The Owners argue that another takings test also applies in this case; they assert that the City's ordinances effect a taking of their property because the ordinances "do not substantially advance legitimate state interests." Although the United States Supreme Court previously held that a regulation "effects a taking if [it] does not substantially advance legitimate state interests," *Agins v. Tiburon*, 447 U.S. 255, 260 (1980), it rejected this test in 2005, *see Lingle*, 544 U.S. at 540 ("We conclude that [the 'substantial advancement' test] prescribes an inquiry in the nature of a due process, not a takings, test, and that it has no proper place in our takings jurisprudence."). Following *Agins*, the Texas Supreme Court has also applied the "substantial advancement" test to state regulatory-taking claims, but it has had no opportunity to address whether the test still applies in light of *Lingle*. We believe that, post-*Lingle*, the Texas Supreme Court would no longer recognize

15

the substantial-advancement test. Even assuming that the test is still valid, however, we find no taking.

"'A broad range of governmental purposes and regulations' will satisfy [the substantial advancement test]." *Mayhew*, 964 S.W.2d at 934 (quoting *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834-35 (1987)).

> The "substantial advancement" requirement examines the nexus between the effect of the ordinance and the legitimate state interest it is supposed to advance. This requirement is not, however, equivalent to the "rational basis" standard applied to due process and equal protection claims. The standard requires that the ordinance "substantially advance" the legitimate state interest sought to be achieved rather than merely analyzing whether the government could rationally have decided that the measure achieved a legitimate objective.

*Id*. (citations omitted). In applying the test, we may consider the City's statements, positions, or findings issued before or after the re-zoning decision. *Sheffield Dev. Co.*, 140 S.W.3d at 675. The City need not prove with certainty that its re-zoning will substantially advance the supposed legitimate state interest. *Id.* at 676. "[T]he actual effects of the City's rezoning are for the future and can only be projected and estimated." *Id.* Thus, a zoning decision meets the substantial advancement test if a zoning authority "could reasonably conclude that the [zoning decision] would substantially advance a legitimate state interest." *Id.* We do not review the wisdom of the City's decision, only its constitutionality. *Mayhew*, 964 S.W.2d at 935.

The City asserts that its ordinances promote a "mixed-use, pedestrian friendly, urban development" that will "enhanc[e] the quality of life of its citizens." The Owners contend that the City's stated goal is a pretext—that its real goal was only to benefit the La Frontera Developer by

16

making its land more valuable. Even if that were true, however, we are not required to consider the City's *actual* purpose. Instead, we look for a "nexus between the effect of the ordinance and the legitimate state interest it is *supposed* to advance." *Id.* at 934 (emphasis added). We hold that the City's stated goal passes this test. The City could reasonably have concluded that increasing housing density in a PUD already zoned for multifamily housing, shopping centers, and office space would advance the legitimate state interest of enhancing the quality of life of citizens by decreasing traffic, lowering commuting times, and encouraging citizens to walk.

Because there is no taking under either test, we overrule this issue.

**Spot Zoning**

The Owners assert that genuine issues of material fact exist as to whether the City performed "spot zoning" by creating PUDs 70 and 72 out of land formerly zoned within PUD 39. Spot zoning is an "unacceptable amendatory ordinance that singles out a small tract for treatment that differs from that accorded similar surrounding land without proof of changes in condition." *Tippitt*, 616 S.W.2d at 177. It is "a preferential treatment which defeats a pre-established comprehensive plan; [i]t is piecemeal zoning, the antithesis of planned zoning." *Id.* Even in the absence of changed conditions, however, a city does not commit spot zoning if a re-zoning amendment bears a "reasonable relation to the general welfare and to an orderly plan of zoning development." *Benners*, 485 S.W.2d at 780.

Whether a zoning ordinance is valid is a question of law. *Tippitt*, 616 S.W.2d at 175. A zoning ordinance is presumed to be valid, and the courts have no authority to interfere with it unless it is "unreasonable and arbitrary—a clear abuse of municipal discretion." *Hunt v. City of*

17

*San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971).  If reasonable minds could differ about whether a zoning ordinance is substantially related to the public health, safety, welfare, morals, or general welfare, then there is no abuse of discretion, and the ordinance stands.  *Id.*  "An extraordinary burden rests on one attacking the ordinance to show that no conclusive or even controversial issuable facts or conditions exist" to support the City's use of its municipal police power.  *Id.*  On the other hand, that presumption vanishes in the presence of spot zoning.  *Tippitt*, 616 S.W.2d at 178.

The supreme court employs several criteria to determine whether an ordinance constitutes spot zoning.  First, "the approved zoning plan should be respected and not altered for the special benefit of the landowner when the change will cause substantial detriment to the surrounding lands or serve no substantial public purpose."  *Tippitt*, 616 S.W.2d at 176.  Second, "[t]he nature and degree of an adverse impact upon neighboring lands is important.  Lots that are rezoned in a way that is substantially inconsistent with the zoning of the surrounding area, whether more or less restrictive, are likely to be invalid."  *Id.* at 177.  Third, "[t]he suitability or unsuitability of the tract for use as presently zoned is a factor."  *Id.*  Fourth, "[t]he amendatory ordinance must bear a substantial relationship to the public health, safety, morals or general welfare or protect and preserve historical and cultural places and areas.  The rezoning ordinance may be justified, however, if a substantial public need exists, and this is so even if the private owner of the tract will also benefit."  *Id.* (citations omitted).

The Owners claim that by "carving" PUDs 70 and 72 from PUD 39 and then applying differing standards and regulations to the new PUDs, the City has acted contrary to its comprehensive zoning plan.  The Owners also assert that the City presents no evidence of changed

18

conditions that warrant a change in zoning. They claim that there are "genuine issues of material facts [sic] as to whether the ordinances creating PUD 70 and PUD 72 were arbitrary, capricious, unreasonable, abusive and not substantially related to the public health, safety, morals or general welfare." The Owners cite evidence that suggests that the impetus for the zoning change was the desires of the La Frontera Developer to re-zone for increased profitability. The Owners also note that the City conducted no traffic-impact analysis and no studies of its ability to provide necessary public services to the new multifamily developments.

The City responds that the zoning changes are consistent with the use of the surrounding land. It also notes that *most* zoning decisions begin with a request from a developer, and nothing about the City's communications with the developer in this case make its re-zoning decision improper. The City cites to evidence that the City Council considered impact on adjacent properties and the provision of necessary municipal services and found no problems. The City also cites to the ordinances themselves, which recite that they were passed to foster a more pedestrian-friendly urban environment. The City does not rely on changed conditions to justify its re-zoning, but rather claims that the re-zoning bears a reasonable relation to the general welfare and to an orderly zoning-development plan.

We conclude that the contested ordinances do not constitute spot zoning. First, we agree with the City that it has generally adhered to an "orderly plan of zoning development." *See Benners*, 485 S.W.2d at 780. The amendatory ordinances creating PUDs 70 and 72 did not create a land use "substantially inconsistent" with the land in PUD 39. Second, the zoning restrictions on the new PUDs are similar to those in PUD 39. The same types of buildings may be built in

19

PUDs 70 and 72 as on the surrounding land. No new uses have been included. The new PUDs do not allow, for example, an industrial plant or a warehouse to be built in the middle of an otherwise mixed-use suburban landscape. In short, the zoning changes in this case are not the type that generally constitute spot zoning. *Cf. Thompson v. City of Palestine*, 510 S.W.2d 579, 581-82 (Tex. 1974) (spot zoning occurred where 4.1-acre residential tract surrounded by other residential land was re-zoned as multi-use land permitting over 100 different uses from "multi-family dwellings and trailer camp or mobile home park to a warehouse or office center"); *Hunt*, 462 S.W.2d at 538-40 (spot zoning occurred where two lots in single-family-zoned area were re-zoned to allow "hospitals, clinics, apartment houses, private clubs, fraternity and sorority houses, child and day care nurseries"); *Weaver v. Ham*, 232 S.W.2d 704, 709 (Tex. 1950) (spot zoning occurred where small parcel of land in single-family zone was re-zoned to apartments). The Owners admit that the land-use changes effected by the City's ordinances are but small alterations to the general requirements of PUD 39. Third, the record suggests that the ordinances were substantially related to the general welfare of the city.

Because spot zoning did not occur in this case, we presume the contested ordinances were valid. *See Hunt,* 462 S.W.2d at 539. Consequently, the City's summary-judgment burden is light. "In moving for a summary judgment, [the government has] the burden of establishing affirmatively by summary judgment proofs that conditions either conclusively support passage of the ordinance or make the action debatable or issuable. Only thus may the proponents establish validity of the ordinance as a matter of law." *Baccus v. City of Dallas*, 454 S.W.2d 391, 392 (Tex. 1970). Therefore, if the City's summary judgment evidence makes it at least debatable whether the

20

contested ordinances were substantially related to the public health, safety, morals, or general welfare, we must affirm the summary judgment.

We think that is the case here. While some evidence suggests an impetus for the contested re-zoning in this case was to assist a private developer, reasonable minds could differ as to whether the ordinances creating PUDs 70 and 72 are substantially related to the public health, safety, morals, or general welfare. Therefore, the district court did not err in granting summary judgment for the City. We overrule this issue.

## Substantive Due Process

The Owners argue that a genuine issue of material fact exists as to whether the City violated their substantive due process rights by acting arbitrarily and capriciously. The City violated the Owners' substantive due process right if the contested ordinances had "no foundation in reason and were a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare." *Mayhew*, 964 S.W.2d at 938. To be constitutional, an ordinance must be designed to achieve a legitimate governmental objective and be rationally related to its purpose. *Id.* If it is at least fairly debatable that the ordinance was rationally related to a legitimate government objective, the ordinance must be upheld. *Id.* We are not concerned with whether the ordinance was effective; we ask only if the City could rationally have believed at the time of enactment that the ordinance would promote its objective. *Id.* We will not set aside an ordinance unless it is clearly arbitrary and unreasonable. *Id.*

For the reasons discussed above, it is at least "fairly debatable" that the City's goal of creating a "pedestrian-friendly urban environment" is rationally related to the re-zoning

21

ordinances. While the Owners claim that the City's stated goal is a pretext, the City has submitted sufficient summary-judgment evidence to make that conclusion at least debatable, therefore meeting their summary-judgment burden. *See Baccus*, 454 S.W.2d at 392. We overrule this issue.

**Promissory Estoppel**

The Owners claim that detrimental reliance, an element of promissory estoppel, "is generally a question of fact" and, therefore, that the City was not entitled to summary judgment. Promissory estoppel, normally an equitable remedy in contract law, is available when a promisee has acted to its detriment in reasonable reliance on an otherwise unenforceable promise. *El Paso Healthcare Sys. Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695, 698 (Tex. App.—El Paso 1997, writ denied). A municipality generally cannot be estopped from performing its governmental functions. *City of White Settlement*, 198 S.W.3d at 773-74. As the Owners correctly note, however, an exception to this rule exists to prevent manifest injustice if granting estoppel would not interfere with the municipality's exercise of its governmental functions. *Id.* The supreme court has applied this exception in only two cases, however. *Id.* at 775. In both cases there was evidence that city officials affirmatively mislead the other parties—both of whom were potential claimants—and that, as a direct result of the claimants' reliance on the city officials' misrepresentations, the claimants lost their ability to sue. *Id.* There was no other alternative remedy for either claimant. *Id.*

We are not persuaded that the present case is so exceptional that it requires equitable relief to prevent a manifest injustice. The Owners have other potential avenues of relief—their other claims in this lawsuit. The availability of other potential relief weighs heavily against granting promissory estoppel. *Id.* The supreme court has thus far only applied equitable estoppel against the

22

government when its misconduct resulted in a complete denial of a litigant's day in court. *See id.* That did not occur here. Therefore, we do not think this is a case where justice requires us to make an exception. We overrule this issue.

**Declaratory Judgment**

The Owners requested declarations that: (1) "their rights vested in La Frontera PUD 39 when they purchased their property in reliance upon the zoning classifications set out in the La Frontera PUD 39 Agreement;" (2) the ordinance that created PUD 39 required the consent of all property owners before it could be amended; (3) and the ordinances creating PUDs 70 and 72 are void because the City acted arbitrarily and capriciously in passing them. The Owners also sought attorney's fees under chapter 37 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code § 37.009 (West 2008) ("The court may award . . . attorney's fees as are equitable and just.").

We have already held that the Owners have no vested rights in a zoning classification, *see Benners*, 486 S.W.2d at 778, and cannot make the City "surrender its authority to determine proper land use by contract," *Super Wash, Inc.*, 131 S.W.3d at 257. We have also held that the City did not act arbitrarily or capriciously in passing the ordinances at issue. Because the City has presented sufficient evidence to make it at least debatable as to whether the ordinances in question were substantially related to the City's legitimate police power, the ordinances are valid. The Owners, therefore, were not entitled to declaratory relief on any of these issues, and attorney's fees were unwarranted.

23

## CONCLUSION

Having overruled the Owners' five issues on appeal, we affirm the judgment of the trial court.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Affirmed

Filed:   January 12, 2010

24