**Reversed and Rendered and Opinion filed April 10, 2025.**



**In The**

# Fifteenth Court of Appeals

### NO. 15-24-00112-CV

**TEXAS PARKS AND WILDLIFE DEPARTMENT AND JOHN SILOVSKY, WILDLIFE DIVISION DIRECTOR, Appellants**

**V.**

**RW TROPHY RANCH, LTD. AND ROBERT WILLIAMS, Appellees**

**On Appeal from the County Court at Law No. 2
Kaufman County, Texas
Trial Court Cause No. 110299-CC2**

## OPINION

Among the constitutional issues we consider in this interlocutory appeal is whether a Texas deer breeder has a vested, constitutionally protected property interest in these wild animals. We join the other courts that have addressed this issue and hold that deer breeders do not have a vested property right in such animals. We also hold that Appellees failed to plead a viable waiver of sovereign immunity as to any of their claims. We therefore reverse the trial court's order

denying Appellants' plea to the jurisdiction and render a judgment of dismissal.

# BACKGROUND

## A. The Department works to mitigate the spread of CWD

The Texas Parks and Wildlife Department (the Department) is generally responsible for wildlife management in Texas.[1] As part of its obligation to protect and conserve the state's wildlife resources, the Department has the authority to "manage" wildlife for "disease diagnosis or prevention."[2] One disease it works to contain is Chronic Wasting Disease (CWD), a type of transmissible spongiform encephalopathy (TSE) that affects susceptible cervid species like white-tailed deer.[3] First detected in Texas in 2012, CWD is caused when abnormal prions convert an animal's normal prion proteins to a misfolded shape, leading to "neurodegenerative damage" and an increased risk of death due to other diseases or directly from CWD. CWD can be spread directly (deer to deer) or indirectly (via a contaminated source), can "remain infectious in the environment for a very long period of time," and has an incubation period of 18-24 months, after which an infected animal will show clinical signs of the disease, including severe emaciation, disorientation, excessive salivation, and shaggy coats. Compared to other states, Texas has a lower prevalence of CWD in its free-ranging and captive white-tailed deer populations, but the state implements management strategies to mitigate its spread, including depopulation—the euthanization of an entire herd.[4]

---

[1] TEX. PARKS & WILDLIFE CODE § 12.001.

[2] *Id.* § 12.013(a).

[3] A transmissible spongiform encephalopathy (TSE) is an infectious condition that "causes holes in the brain." Other examples include mad cow disease (Bovine Spongiform Encephalopathy) and scrapie in sheep.

[4] *See* TEX. PARKS & WILDLIFE CODE §§ 12.013(a) (authorizing TPWD to "take" deer for disease diagnosis or prevention), 43.953(b) (authorizing destruction of deer to "control or prevent the spread of disease").

**B.    CWD at RW Trophy Ranch**

Texas generally prohibits the possession of white-tailed deer, but it does permit "breeder deer" to be "held in captivity for propagation" pursuant to a permit issued by TPWD and in compliance with relevant statutes and regulations.[5] Appellant Robert Williams holds such a permit. He breeds white-tailed deer at RW Trophy Ranch, his 68-acre deer breeding facility, surrounded by a 1500-acre release site, located in Hunt and Kaufman Counties.

CWD was first detected in one of Williams's deer in February 2021. To mitigate its spread, the Department offered Williams a number of herd and research plans that did not involve complete depopulation of the deer in his breeding facility. The Department was willing to consider alternatives to total depopulation because, at the time, the low prevalence of CWD at the facility was capable of being managed through other means. But Williams rejected each of the plans. By February 2022, eight more deer had died with CWD at RW Trophy Ranch. This was followed by an "alarming increase" in the number of CWD-positive mortalities at the facility beginning around the summer of 2022. By the following summer, deer at the facility were dying at four times the rate they were when CWD was first detected. The death rate correlated with the number of CWD-positive mortalities, which jumped from 25% in 2021 to 95% in 2023—figures described by the Department as "unheard of." The rise in CWD at RW Trophy Ranch also corresponded with a change in the Department's approach to managing the outbreak—and the onset of litigation.

**C.    Trial court proceedings**

In early 2022, the Department notified Williams that it would "euthanize and

---

[5]    *Id.* §§ 43.364, 43.351–.369, 63.001(a)–.002. "Breeder deer" means "a white-tailed deer or mule deer legally held under a permit authorized by this subchapter." *Id.* § 43.351(1).

initiate postmortem disease testing of all the deer" in his breeding facility no earlier than February 28, 2022. The notice came soon after Williams and RW Trophy Ranch sued the Department and Wildlife Division Director John Silovsky in Travis County, where they also sought a temporary restraining order (TRO) preventing depopulation.[6] After the trial court denied the TRO request, Williams and RW Trophy Ranch sued the Department and Silovsky in Kaufman County, where they alleged due process and takings claims relating to the depopulation order and again sought a TRO against depopulation.[7] On February 28, 2022, the Kaufman County trial court issued an ex parte order temporarily restraining the Department from depopulating Williams's deer.

The next month saw a flurry of filings. The Department filed a plea to the jurisdiction, supported by additional briefing, arguing that sovereign immunity barred Williams's due process claim because he has no vested property or liberty interest in his breeder deer and because his takings claim was unripe. The Department again notified Williams by letter on March 18 that it would depopulate the deer at his breeding facility, this time no sooner than April 4, 2022. Williams amended his petition to request an injunction enjoining depopulation, as well as allegations that Section 43.593 of the Parks and Wildlife Code (addressing destruction of breeder deer) violated due course of law for not requiring a pre-depopulation hearing, that he has a constitutionally protected possessory interest in his deer breeding permit, and that the Department violated Article 1, Sections 8 and Section 9 of the Texas Constitution. Regarding the Department's jurisdictional

---

[6]     Williams and RW Trophy Ranch also sued the Texas Animal Health Commission (TAHC) and Executive Director Andy Schwartz relating to a quarantine order issued by TAHC.

[7]     Rebuffing the Department's charge of forum shopping, Williams asserted that he had nonsuited (by amended petition) the claims in the Travis County suit regarding "the constitutionality of the TPWD kill statute and its threatened effect on Plaintiffs' business and land, in favor of refiling in Kaufman County."

plea, Williams countered that he has a legally protected interest in his deer and a possessory interest in his permit, and that his claims challenging the constitutionality of Section 43.593 were not barred.

After a March 29, 2022 hearing on the Department's plea, the trial court granted Williams a second TRO on April 1, 2022 prohibiting depopulation. Construing the trial court's ruling as an implicit denial of its plea to the jurisdiction, the Department appealed to the Dallas Court of Appeals, but that court disagreed that the trial court had implicitly denied the Department's plea and dismissed the appeal.[8]

When the case returned to the Kaufman County court in 2023, the Department requested a ruling on its plea to the jurisdiction but did not immediately get one. The Department later filed additional briefing in support of its plea—observing that RW Trophy Ranch was now "home to the worst [CWD] outbreak ever seen in Texas"—and sent Williams another letter dated August 3 notifying him that it intended to depopulate his breeding facility no sooner than August 14, 2023. Williams amended his petition to add claims that the Department violated his rights to hunt and to equal protection. On August 10, the trial court signed a third TRO prohibiting depopulation and set a hearing on Williams's application for a temporary injunction.

The trial court held a two-day evidentiary hearing in late August 2023 on Williams's request for a temporary injunction and the Department's plea to the jurisdiction. Williams's witnesses opined that his deer were in exceptional shape, attributed the sharp rise in deer mortalities at RW Trophy Ranch to Epizootic Hemorrhagic Disease (EHD), and generally discounted the threat posed by CWD

---

[8] *See Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*, 2022 WL 1314692, at *2 (Tex. App.—Dallas May 3, 2022, pet. denied).

to the health of white-tailed deer. Williams outright denied that deer could die from CWD: "There's lots of things that kill deer, but CWD is not one of them." And his counsel claimed the Department's efforts were aimed at "eliminating deer breeders."

The Department's witnesses opined that depopulating Williams's breeder deer was now necessary to prevent CWD from spreading to, and thus increasing the health risks of, both free-ranging and captive white-tailed deer. They clarified that the Department tests dead deer not to determine whether they died *of* CWD, but rather *with* CWD. This is because animals with CWD are 4.5 times more likely to die than animals without it, and so whether a deer ultimately died of EHD or some cause other than CWD does not mean that the deer did not *have* CWD and was thus capable of spreading it to other deer and reducing their life expectancy. Responding to opposing counsel's question attributing the presence of misfolded prions to scrapie instead of CWD, one Department official explained, "Well, regardless of what you call the disease, it's a TSE and it's having impacts on the deer and the deer herd…. You could call it snuffleupagus disease if you want to, but it's still having an effect on those deer."

The trial court denied the Department's plea to the jurisdiction and granted a temporary injunction enjoining the Department from depopulating Williams's deer.[9]

## D.    Appellate proceedings

The Department appealed both rulings to the Dallas Court of Appeals. Because the appeal superseded the temporary injunction, Williams filed a Rule 29.3 motion for an order prohibiting the Department from depopulating his deer.[10]

---

[9]    The trial court noted, "I think that a lot of this science was quite frankly unscientific."

[10]    Appellees' Motion for Interim Order Under TRAP 29.3, *Tex. Parks & Wildlife Dep't v.*

The Dallas Court granted the motion and ordered the Department "not to depopulate appellees' captive-bred whitetail deer pending resolution of th[e] interlocutory appeal."[11]

The Department challenged the Dallas Court's ruling on the Rule 29.3 motion by filing a petition for writ of mandamus in the Texas Supreme Court, along with a motion for temporary relief seeking a stay of the Dallas Court's stay order.[12] On April 5, 2024, the Texas Supreme Court conditionally granted the Department's motion.[13] On May 29, 2024, the Department "completed the total depopulation of the breeder deer in the breeding facility owned and operated by Appellees RW Trophy Ranch Ltd. and Robert Williams."[14]

Soon after receiving notice of the depopulation, the Dallas Court requested supplemental briefing by the parties "addressing th[e] Court's jurisdiction over the present appeal and whether any part of the appeal has become moot."[15] Both sides filed supplemental briefs, but the appeal was transferred to this Court before the Dallas Court issued an opinion.[16] The Dallas Court held oral argument on January 30, 2024.[17]

---

*RW Trophy Ranch, Ltd.*, No. 05-23-00906-CV (Tex. App.—Dallas Sept. 18, 2023).

[11] Order, No. 05-23-00906-CV (Tex. App.—Dallas October 9, 2023).

[12] Petition for Writ of Mandamus & Emergency Motion for Temporary Relief, *In re Tex. Parks & Wildlife Dep't*, No. 23-0966 (Tex. Nov. 30, 2023).

[13] Order, *In re Tex. Parks & Wildlife Dep't*, No. 23-0966 (Tex. April 5, 2024).

[14] Appellants' Advisory Regarding Depopulation of Appellees' Deer Breeding Facility, No. 05-23-00906-CV (Tex. App.—Dallas June 6, 2024).

[15] Order, No. 05-23-00906-CV (Tex. App.—Dallas June 11, 2024).

[16] *See Transfer of Case From the Fifth Court of Appeals to the Fifteenth Court of Appeals*, Misc. Docket No. 24-9089 (Tex. Oct. 21, 2024).

[17] The Department moved to dismiss its mandamus petition in the Texas Supreme Court, stating that although its "jurisdictional challenge remains pending at Texas's Fifth Court of Appeals, there is no remaining issue for the Court in this case." Relators' Motion to Dismiss for

# DISCUSSION

## I. Mootness

We first consider whether Williams's claims were mooted by the Department's depopulation of the breeder deer at his facility. The Department took the position in its supplemental briefing in the Dallas Court of Appeals that, except for the takings claim, "Williams's claims related to restraining [the Department's] depopulation of the breeding facility are now moot." Williams responded that his claims seeking equitable relief are not moot and, alternatively, that two exceptions to the mootness doctrine apply—"capable of repetition" and "collateral consequences." We agree with the Department that Williams's claims are moot (save his takings claim), but we also agree with Williams that the capable-of-repetition exception applies.

"A case becomes moot if, since the time of filing, there has ceased to exist a justiciable controversy between the parties—that is, if the issues presented are no longer 'live,' or if the parties lack a legally cognizable interest in the outcome." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012). "Put simply, a case is moot when the court's action on the merits cannot affect the parties' rights or interests." *Id.*; *see Glassdoor, Inc. v. Andra Grp., LP*, 575 S.W.3d 523, 530 (Tex. 2019).

Williams acknowledges that "the majority" of his claims seek equitable injunctive relief aimed at "saving his herd of captive bred deer from senseless slaughter." This includes his due course of law, ultra vires, and equal protection claims, and his claims implicating Article I, Sections 8 and 34 of the Texas Constitution. But the Department depopulated his breeding facility after the Texas

---

Mootness, *In re Tex. Parks & Wildlife Dep't*, No. 23-0966 (Tex. July 12, 2024). The petition remains pending.

8

Supreme Court conditionally granted the Department's request to stay the Dallas Court's Rule 29.3 order. Consequently, whatever decision this Court makes in this appeal, the Court cannot save Williams's herd from depopulation, and therefore cannot directly affect the rights or interests that he seeks to protect through those claims. This means they are moot.[18] *See Heckman*, 369 S.W.3d at 162; *Johnson v. Tex. Parks & Wildlife*, 2014 WL 1432177, at *2 (Tex. App.—Austin Apr. 8, 2014, no pet.) ("Because the herd-reconciliation activities Johnson sought to enjoin have already occurred, the subject matter of the application for temporary injunction from which Johnson appeals is moot.").

But we also conclude that this case fits within an exception to mootness.

The capable-of-repetition-yet-evading-review exception applies when "the challenged act is of such short duration that the appellant cannot obtain review before the issue becomes moot." *Tex. A&M Univ.-Kingsville v. Yarbrough*, 347 S.W.3d 289, 290 (Tex. 2011). There must be a "reasonable expectation that the same action will occur again if the issue is not considered," and the plaintiff must show "that the claim is capable of repetition *as to him*." *Heckman*, 369 S.W.3d at 164; *Yarbrough*, 347 S.W.3d at 290.

It is reasonable to expect that Williams will continue to breed white-tailed deer. He has held a deer breeder's permit since it became a requirement many years ago, and he still owns and lives on RW Trophy Ranch with his family. "[O]ne of the oldest deer breeding facilities in Texas," RW Trophy Ranch is a "money-making operation" that Williams claims has no economically viable use

---

[18] Williams argues that he "continues to have a viable interest in the equitable relief he seeks" because the Department may enter upon and kill deer located on his 1500-acre release site that surrounds his breeding facility, but there is no record support for this contention. Indeed, each of the letters issued by the Department noticing its intent to depopulate has been directed at the deer held in Williams's breeding facility (Facility 170B), not at any deer in his release site (Facility 170R).

besides breeding deer. At the hearing on the request for a temporary injunction, Williams expressed his belief that deer do not die of CWD.

It is also reasonable to expect that the Department will use depopulation if CWD is detected in Williams's breeder deer in the future—a distinct possibility given that CWD "can remain infectious in the environment for a very long period of time" and Williams failed to take adequate precautions to control its spread when it was first detected at his facility, perhaps due in part to his belief that deer do not die of CWD. Williams was successful in enjoining the Department from depopulating his deer, but he might not always achieve the same result, nor can he stop the Department from obtaining appellate relief to eliminate an adverse injunction or stay order and proceeding with depopulation. That happened before Williams was able to obtain judicial review of his claims in this case, and it very well could happen again if the parties were to find themselves back in the same place they are now at some point in the future.

On this record, the controversy between the parties over the Department's depopulation mitigation strategy is capable of repetition but evading review. We proceed to the merits.

## II. Plea to the Jurisdiction

The Department argues that the trial court erred by denying its plea to the jurisdiction because Williams failed to plead a legally viable waiver of sovereign immunity as to any of his claims. Williams responds that the trial court has jurisdiction over all of his constitutional claims. We agree with the Department.

### A.    Standard of Review

State agencies like the Department are generally entitled to sovereign

10

immunity.[19] Sovereign immunity from suit defeats a trial court's subject-matter jurisdiction and is properly raised in a plea to the jurisdiction.[20] When, as here, a plea to the jurisdiction challenges the pleadings, we determine if the pleader alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case.[21] We construe the pleadings liberally in favor of the plaintiff while looking to the pleader's intent.[22] We review the trial court's order de novo.[23]

## B.     Due Course of Law

We first consider whether the Department retains sovereign immunity from Williams's due course of law challenges because he does not have a vested, constitutionally protected property interest in his breeder deer.[24]

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities … except by the due course of the law of the land."[25] But "[b]efore any substantive or procedural due-process rights attach," a "citizen must have a liberty or property interest that is entitled to constitutional protection."[26] "[T]o be constitutionally protected, a

---

[19]     *Matzen v. McLane*, 659 S.W.3d 381, 387 (Tex. 2021); *see* TEX. PARKS & WILDLIFE CODE § 11.011.

[20]     *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004).

[21]     *Id.* at 226.

[22]     *Id.*

[23]     *Matzen*, 659 S.W.3d at 388.

[24]     Williams alleged that Section 43.953 of the Parks and Wildlife Code violates procedural due process, both facially and as applied, because it does not require a hearing before depopulation. Citing *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69 (Tex. 2015), Williams also alleged that the "summary seizure and destruction of breeder deer" violates substantive due process because it is an "unreasonable regulation in light of the facts related to CWD."

[25]     TEX. CONST. art. I, § 19. There is no meaningful distinction between Texas's due course of law guarantee and the federal due process clause. *See Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).

[26]     *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018). Our focus here

11

property interest must be vested."[27] A right is vested, and thus constitutionally protected, when one has a "legitimate claim of entitlement rather than a mere unilateral expectation."[28] Stated otherwise, "[w]hen an interest is predicated upon the anticipated continuance of an existing law and is subordinate to the legislature's right to change the law and abolish the interest, the interest is not vested."[29] If a party lacks a vested interest, its due course of law claim is facially invalid and barred by sovereign immunity.[30]

In Texas, all wild animals—including white-tailed deer—belong to the state, as trustee for the people.[31] It is illegal to possess them "for any purpose not authorized by" the Parks and Wildlife Code.[32] That code authorizes a person to hold live deer captive for only two purposes: breeding and management.[33] Our concern here is with breeding.

The Department's authority to issue hunting and fishing licenses includes

---

is on a property interest.

[27]     *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 655 (Tex. 2022).

[28]     *Honors Acad.*, 555 S.W.3d at 61; *see City of Grapevine v. Muns*, 651 S.W.3d 317, 345 (Tex. App.—Fort Worth 2021, pet. denied) (stating right is vested when it "has some definitive, rather than merely potential existence"); *Vested*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Having become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute").

[29]     *Crown Distrib. LLC*, 647 S.W.3d at 655; *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (explaining that interest is not protected by due process "if government officials may grant or deny it in their discretion").

[30]     *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 17 (Tex. 2015).

[31]     TEX. PARKS & WILDLIFE CODE §§ 1.011(a), 1.101(4) ("'Wild' when used in reference to an animal, means a species, including each individual of a species, that normally lives in a state of nature and is not ordinarily domesticated"); *See Crowder v. USDA*, 2023 WL 4824931, at *1 (W.D. Tex. July 27, 2023).

[32]     TEX. PARKS & WILDLIFE CODE §§ 63.001(a), 63.002; *see also id.* § 43.353.

[33]     *Id.* §§ 43.351–.369, 43.601–.607.

the power to issue a "Deer Breeder's Permit," one of several so-called "Special Licenses and Permits."[34] Contained in Subchapter L to Chapter 43 of the Parks and Wildlife Code, the statutes governing deer breeding in Texas cover a wide range of topics and impose numerous requirements and conditions on the activity, including the following:

- Definitions: "deer" means white-tailed deer or mule deer, and "breeder deer" means those two types of deer "legally held under a permit authorized by this subchapter";[35]

- Permit required: "breeder deer may be held in captivity for propagation … only after a deer breeder's permit is issued by the department under this subchapter";[36]

- Permit duration: a permit may issue for one, three, or five years, with the latter two subject to revocation before they expire;[37]

- Identification: detailed requirements apply for identifying breeder deer;[38]

- Authorized deer breeder actions: selling, transferring, or holding in captivity live breeder deer "for the purpose of propagation or sale";[39]

- Rulemaking authority: the Department may make regulations governing deer breeding;[40]

- Inspection: the Department may "inspect at any time and without a

---

[34]    *Id.* §§ 43.351–.369.

[35]    *Id.* § 43.351(1), (4).

[36]    *Id.* § 43.364; *see id.* § 43.352(a) ("The department shall issue a permit to a qualified person to possess live breeder deer in captivity.").

[37]    *Id.* § 43.352(b)–(d).

[38]    *Id.* § 43.3561.

[39]    *Id.* §§ 43.357(a)(2), 43.362.

[40]    *Id.* § 43.357(b).

warrant" a deer pen and deer breeding records;[41]

- Records: deer breeders must maintain records and reports regarding breeder deer;[42]

- Enclosure size: a single enclosure is limited to 100 acres;[43]

- Release site requirements: "surrounded by a fence not less than seven feet in height that is capable of retaining deer at all times";[44] and importantly

- Application of other laws: breeder deer "are under the full force of the laws of this state pertaining to deer."[45]

Two "laws of this state pertaining to deer" prohibit the possession of live game animals—defined to include a white-tailed deer—"for any purpose not authorized by this code."[46] Another set of "laws of this state pertaining to deer" permit the Department to take and destroy breeder deer to prevent the spread of disease, discussed more fully below.[47] The Department's deer breeding regulations align with the statutes, prohibiting the possession of live deer without a permit and affording the Department discretion when issuing a permit.[48]

Texas deer breeders like Williams thus enjoy the privilege of possessing and breeding deer in captivity only pursuant to a permit issued by the Department and in compliance with detailed statutes and regulations, several of which authorize the

---

[41]     *Id.* § 43.358.

[42]     *Id.* § 43.359.

[43]     *Id.* § 43.360.

[44]     *Id.* § 43.361(a).

[45]     *Id.* § 43.364; *see id.* § 43.366(a) (breeder deer "are subject to all laws and regulations of this state pertaining to deer).

[46]     *Id.* §§ 63.001, .002.

[47]     *Id.* §§ 12.013(a), 43.953.

[48]     *See, e.g.*, 31 Tex. Admin. Code §§ 65.602(a), 65.603(c), (d).

Department's depopulation efforts in this case.[49] Any interest Williams claims in his breeder deer is subordinate to the Legislature's right to amend the laws governing deer breeding, or to abolish the interest altogether. This is precisely the type of interest that is *not* vested.[50]

Other courts have reached the same conclusion. In *Bailey v. Smith*, the Third Court of Appeals held that "Subchapter L is clear that deer breeders have no vested property interest in their breeder deer."[51] The court rejected the argument that white-tailed deer could be removed from the wild and held in captivity without a permit.[52] It also rejected the notion that a vested property right in breeder deer could arise via the common law.[53]

The Fifth Circuit has also concluded that Texas deer breeders lack a constitutionally protected property interest in breeder deer.[54] The court described the "provisions regulating the deer breeder industry" as "extensive" and observed that "breeder deer belong to the state, not the permittee," "the deer are only held under a permit," and "[n]owhere do the statutes or regulations state that breeder

---

[49]    Williams expressly agreed to comply with the statutes and regulations governing deer breeding when he submitted his application for a permit.

[50]    *See Crown Distrib. LLC*, 647 S.W.3d at 655.

[51]    581 S.W.3d 374, 394 (Tex. App.—Austin 2019, pet. denied).

[52]    *Id.* at 390–92 (reasoning that public trust doctrine—codified in Parks and Wildlife Code Section 1.011(a)—requires an animal to be "legally removed" from the wild before property rights could attach to it, but the Legislature foreclosed that occurrence by prohibiting a person from possessing deer without a permit).

[53]    *Id.* at 393 (reasoning that Sections 43.364 and 43.366, which make breeder deer subject to the "laws" of this state, refer not to the common law, but to the law relating to wild animals and their status as public property, and that "allowing private property rights to arise in breeder deer is incompatible with the Legislature's direction that breeder deer are 'held under a permit'").

[54]    *Anderton v. Tex. Parks & Wildlife Dep't*, 605 F. App'x 339, 346–47 (5th Cir. 2015) ("If government officials may grant or deny the interest in their discretion, the interest is not protected by due process.").

deer become the property of a permit holder."[55]

Using the common law rule of capture as a backstop, Williams argues that the Parks and Wildlife Code "does not deprive the deer breeder of his common law property interest in the breeder deer through legal captivity and dominion," but instead "simply imposes conditions on how and when deer may be held captive." Williams points to Section 43.357, which says a deer breeder may "sell" and "transfer to another person" live breeder deer. But while breeder deer can be sold and transferred, they may be "purchased" and "received"—the logical consequences of being sold and transferred—"only for the purposes of liberation or holding for propagation."[56] Deer sold or transferred are thus either freed (onto a release site[57]) or continue on as breeder deer. In the latter scenario, the Legislature clarified in the very same provision that deer may be held "for propagation … only after a deer breeder's permit is issued."[58] William's theory that deer breeders have a vested property interest in breeder deer under some common-law authority running parallel to, but not inconsistent with, Subchapter L is incompatible with the Legislative scheme completely regulating deer breeding.

Approaching the issue from a different common-law angle, Williams argues that deer breeders obtain a vested property right in breeder deer because "wild animals become property when removed from their natural liberty and made subject to man's dominion."[59] The criminal cases Williams cites relied on that rule in examining whether a wild animal could be the subject of a criminal offense like

---

[55]  *Id.* at 344, 348.

[56]  TEX. PARKS & WILDLIFE CODE § 43.364.

[57]  *Id.* § 43.361(a).

[58]  *Id.* § 43.364. A permit is even needed to "purchase" or "obtain" or "accept" live breeder deer. *Id.* § 43.362.

[59]  *See Runnels v. State*, 213 S.W.2d 545, 547 (Tex. Crim. App. 1948).

theft or criminal mischief.[60] But while a deer breeder may have "qualified rights of ownership or possession of white-tailed deer" such that a person is amenable to prosecution for certain crimes involving a breeder deer, that right remains subordinate and subject to the Legislature's authority to regulate the deer breeding industry.[61] In this context, a possessory right does not equate to a vested right.

Williams looks to the bankruptcy context for support, but a similar rationale applies. Although a deer breeder may have a "possessory interest" in the deer and an "expectancy interest in profits derived from those deer" such that the deer may be considered property of a bankruptcy estate, it does not necessarily follow that those interests give rise to a heightened vested property interest entitled to due process protection.[62]

In his last attempt to bypass the Parks and Wildlife Code in favor of the common law, Williams argues that the definition of "game animal" in Section 63.001—and by extension Section 63.002's declaration that white-tailed deer cannot be possessed unless otherwise provided by the Code—"does not control the issue of property rights in wild animals *while in captivity*."[63] But *Wiley* involved a conversion claim between private parties, not a due process-based allegation by a

---

[60]   *Id.* ("Wild animals are not subject to theft until they become the property of an owner."); *Jones v. State*, 45 S.W.2d 612, 614 (Tex. Crim. App. 1931); *State v. Bartee*, 894 S.W.2d 34, 43 (Tex. App.—San Antonio 1994, no pet.) ("A white-tailed deer in its natural state of liberty cannot be the subject of the theft and criminal mischief statutes.").

[61]   *Bartee*, 894 S.W.2d at 43 ("The State, as trustee, has the power to regulate the taking and acquisition of property in wild animals by individuals by imposing such restrictions and conditions as the legislature may see fit.").

[62]   *In re Wheeler*, 431 B.R. 158, 160, 162 (N.D. Tex. 2005).

[63]   *See Wiley v. Baker*, 597 S.W.2d 3, 5 (Tex. Civ. App.—Tyler 1980, no writ) (reasoning that the "statutory definition of 'game animal'" was "not applicable" to "whether appellant had a property right in the elk at the time appellee shot it").

deer breeder.[64] "[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."[65]

Williams finally contends that he has a protected property interest in his deer breeder's permit, but the Department has not sought to revoke his permit, and so that argument is not ripe for consideration.

We sustain this part of the Department's first issue.

## C. Ultra Vires

Williams gave little detail into the specifics of his ultra vires claim, generally averring in his live petition that Silovsky and Department officials "have acted *ultra vires*." But he did state at the outset of the petition that the officials acted ultra vires by planning to "kill[] all of the deer on [his] ranch … without providing any kind of due process hearing, without probable cause, and without exigent circumstances." Williams did not plead a valid ultra vires claim.

"Plaintiffs who seek to bypass sovereign immunity using an ultra vires claim must plead, and ultimately prove, that the defendant government official acted without legal authority or failed to perform a ministerial duty."[66] Williams alleged the former.[67] "An officer acts without legal authority if he exceeds the bounds of his granted authority or if his acts conflict with the law itself."[68] But if "the actions alleged to be ultra vires were not truly outside the officer's authority or in conflict

---

[64] *Id.* at 4.

[65] *Turkiye Halk Bankasi A.S v. United States*, 598 U.S. 264, 278 (2023).

[66] *Matzen*, 659 S.W.3d at 388.

[67] *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (confirming that ultra vires suits proceed against government actors in their official capacity).

[68] *Matzen*, 659 S.W.3d at 388.

with the law, the plaintiff has not stated a valid ultra vires claim and therefore has not bypassed sovereign immunity."[69]

The Department's depopulation efforts are governed by several statutes contained in the Parks and Wildlife Code. The first is Section 12.013. As explained, the Department's responsibility to manage Texas wildlife includes the authority to "take" deer for "disease diagnosis or prevention."[70] The Legislature defined "take" to mean "*collect*, hook, hunt, net, *shoot*, or snare, by *any* means or device."[71] The Department's power to take deer for disease diagnosis or prevention expressly applies to deer held in captivity pursuant to a permit issued under Subchapter L.[72]

The other guiding statutes are found in the same chapter that governs deer breeder permits. Section 43.953, entitled, "Destruction of Deer," contains three limitations on the Department's authority to take deer for disease diagnosis or prevention:

- before deer may be destroyed, the Department "must consider the results of" an epidemiological assessment conducted by a TAHC agent, if one is conducted;

- to "control or prevent the spread of disease," deer subject to the subchapter "may be destroyed only if the department determines that the deer pose a threat to the health of other deer or other species, including humans"; and

- the Department "shall carry out an order to destroy deer after notice

---

[69]    *Id.*

[70]    TEX. PARKS & WILDLIFE CODE § 12.013(a).

[71]    *Id.* § 1.101(5) (emphasis added).

[72]    *Id.* §§ 43.366(a) ("breeder deer held under a deer breeder's permit are subject to all laws and regulations of this state pertaining to deer except as specifically provided in this subchapter"); 43.951(1).

has been provided to the permit holder under Section 43.954."[73]

Section 43.954 requires the written notice to contain the "date of destruction," which cannot be "sooner than the 10th day after the date of the notice," and "an explanation of the reasons for the destruction, including the results of any epidemiological assessment conducted under Section 43.953(a)," among other things.[74]

None of these provisions require the Department to conduct a hearing, possess probable cause, or establish exigent circumstances before destroying breeder deer. By failing to allege that Silovsky or some other Department official acted without authority or contrary to controlling law, Williams failed to plead a viable ultra vires claim.[75]

Williams now argues on appeal that Silovsky "ignore[d] the statutory standard in section 43.953 of 'threat to the health of other deer or other species, including humans.'" As support, he points to his own evidence presented at the hearing on the temporary injunction vigorously disputing that CWD is a threat to other deer. Section 43.953(a), however, plainly requires *the Department* to determine that the deer identified for destruction pose a threat. The Department's August 3, 2023 letter notifying Williams of its intent to depopulate his breeder deer reflects that determination. Williams disagrees with the Department's determination, but Section 43.953 as written does not "allow third parties to second-guess the [Department's] decision in this way."[76] Williams directs us to

---

[73] *Id.* § 43.953.

[74] *Id.* § 43.954(b).

[75] We do not mean to suggest that a deer breeder could *never* plead a viable ultra vires claim, but on this record and with these arguments, Williams did not do so.

[76] *See Schroeder v. Escalera Ranch Owners' Ass'n, Inc.*, 646 S.W.3d 329, 335 (Tex. 2022) (holding that zoning and planning commission did not act ultra vires by complying with legal

potentially conflicting statements made by the Department regarding the health impacts of CWD on *humans*, but that does not mean the Department did not determine that CWD poses a threat to other *deer*. Williams lastly contends that the Department did not meet Section 43.953(a)'s epidemiological-study requirement, but the Department's letter contained a paragraph devoted precisely to that requirement.

We sustain this part of the Department's first issue.

## D. Regulatory Taking

Williams also alleged that the Department's efforts to depopulate his breeder deer amounted to a regulatory taking of his breeding facility in violation of Article I, Section 17 of the Texas Constitution.[77] Williams averred that he has made improvements to the 68-acre breeding facility and that the property cannot be easily converted to another use. In a supplement to his petition, Williams claimed that the Department took his real property by prohibiting him from doing anything with his land unless he agreed to "an exaction in the form of a 'herd plan.'"

"[I]t is well settled that a governmental entity may be sued for inverse condemnation, by either a public or private landowner, for taking the owner's property without paying just compensation."[78] But a plaintiff must "establish a viable takings claim" for sovereign immunity to be waived.[79] A regulatory taking "is a condition of use so onerous that its effect is tantamount to a direct

---

duty to determine whether plat conformed to law).

[77] Unlike with breeder deer, it is well established that property owners have a vested interest in their land. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972).

[78] *Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 187 (Tex. 2023).

[79] *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013).

appropriation or ouster."[80] Regulatory takings can take several different forms, but Williams's pleadings implicate two: a *Penn Central* taking and an exaction taking.[81] We address each one in turn.

A *Penn Central* taking occurs when a government regulation unreasonably interferes with a landowner's use and enjoyment of his property.[82] This is an ad-hoc, fact-intensive inquiry in which all surrounding circumstances must be considered—an inquiry that "requires a careful analysis of how the regulation affects the balance between the public's interest and that of private landowners."[83] Guiding considerations include (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action.[84] The ultimate question is whether the regulation has gone "too far" so as to constitute a taking.[85]

Williams did not allege a viable regulatory takings claim premised upon the Department's depopulation efforts. To begin, we have a difficult time understanding how euthanizing breeder deer represents a restriction on the use of Williams's land.[86] It is a physical act aimed at mitigating the spread of CWD, not a

---

[80] *City of Houston v. Carlson*, 451 S.W.3d 828, 831 (Tex. 2014); *see Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (stating regulatory taking occurs "when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs").

[81] *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 548 (2005) (identifying a "physical taking," a "*Lucas*-type total regulatory taking," a "*Penn Central*" taking, and a "land-use exaction"); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 671–72 (Tex. 2004).

[82] *Sheffield*, 140 S.W.3d at 671–72.

[83] *Id.* at 672.

[84] *Id.*

[85] *Id.* at 670 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

[86] *See City of Houston*, 451 S.W.3d at 831 ("Yet the respondents do not contest any of

22

restriction on how Williams uses his property.

Insofar as a connection can be made between depopulation and property use, the Department made the difficult decision to destroy Williams's deer in compliance with an express statutory mandate to prevent the spread of disease in the state's deer—deer that Williams possessed only because the State allowed him to do so. If not for this important responsibility, the Department would have no reason to set foot onto his land. When it does, the interference is limited in both duration and scope. The interference to the land is similarly limited after depopulation, as Williams still has a deer breeding permit and may continue to operate his breeding facility and produce income. We also cannot ignore that Williams rejected the Department's early efforts to mitigate the spread of CWD without using total depopulation. We are not insensitive to the frustration and disappointment that comes with depopulation, including the potential financial impact resulting from depopulation, but our task is to weigh the public interest against the private ones, and the former significantly outweighs the latter, especially considering the Department's representations that the CWD outbreak at RW Trophy Ranch was the worst in Texas history. Giving due consideration to all relevant considerations and circumstances, the Department's depopulation efforts did not go "too far" so as to rise to a regulatory taking.[87]

In a supplemental petition, Williams claimed that the Department took his land by "prohibiting [him] from doing anything with the land unless he agree[d] to an exaction in the form of a 'herd plan' that would convey to the State an interest in land akin to a restrictive covenant for which the state would pay nothing." In an exaction takings case, "the landowner is not simply denied or restricted in some

---

Houston's property-use restrictions.").

[87]    *Sheffield*, 140 S.W.3d at 670.

desired use of his property," but rather "some action … is required of the landowner as a condition to obtaining government approval."[88]

The herd plan attached to Williams's original petition sought to mitigate the spread of CWD in the breeder deer at RW Trophy Ranch. It contained all the provisions one would expect to see in such a document—movement restrictions for infected deer, facility standards, record keeping, and protocols for releasing deer, among other things. The herd plan did authorize the Department to enter onto Williams's property, but only to perform its responsibilities relating to CWD. There is nothing in the herd plan (or the record) to support a claim that the Department limited Williams's land ownership or financial interests other than breeding deer in conditions that threatened the State's interest in wildlife management. Williams would have preferred to release his bucks to be hunted by individuals participating in the "wounded heroes" program, but that was a personal preference related to the disposition of his breeder deer, not his land.[89]

We sustain this part of the Department's first issue.

## E.    Right to Hunt

Williams alleged that the Department's depopulation efforts under Section 43.953 of the Parks and Wildlife code cannot be squared with, and are thus violative of, Article I, Section 34 of the Texas Constitution, which provides that "[h]unting and fishing are preferred methods of managing and controlling

---

[88]    *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 71 S.W.3d 18, 30 (Tex. App.—Fort Worth 2002) (citing *Dolan v. City of Tigard*, 512 U.S. 374 (1994)), *aff'd* 135 S.W.3d 620 (Tex. 2004)).

[89]    Insofar as Williams's petition can be construed to raise a physical type of regulatory taking, the trial court properly rejected that theory because there is no allegation or indication that depopulation would cause a "permanent physical occupation" of Williams's land. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); *Sheffield*, 140 S.W.3d at 671.

wildlife." TEX. CONST. art. 1, § 34(b). According to Williams, the Department "should be called to task to explain why the alternative of harvest is not considered, even for deer that test positive for or are exposed to CWD."

Sovereign immunity does not bar a suit for equitable relief based upon an alleged violation of the Texas Constitution, *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007), but immunity is waived only insofar as the plaintiff pleads a viable constitutional claim. *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015); *Eriksen v. Nelson*, 2025 WL 351632, at *4 (Tex. App.— 15th Dist. Jan 30, 2025, no pet.). "To satisfy this showing, plaintiffs must do more than merely name a cause of action and assert the existence of a constitutional violation." *Hughs v. Dikeman*, 631 S.W.3d 362, 373 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

The constitutional right to hunt is subject "to laws or regulations to conserve and manage wildlife and preserve the future of hunting and fishing." TEX. CONST. art. 1, § 34(a). Section 43.953, which authorizes the Department to destroy deer to "control or prevent the spread of disease," is one such law.[90] Williams did not plead a viable constitutional claim because the Constitution expressly contemplates the very action that forms the basis of his complaint.

We sustain this part of the Department's first issue.

## F. Free Speech

Williams alleged that the Department violated his free speech rights as guaranteed by Article 1, Section 8 of the Texas Constitution[91] by stating in its

---

[90] TEX. PARKS & WILDLIFE CODE § 43.953(b).

[91] "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." TEX. CONST. art. 1, § 8.

August 3, 2023 notice that it would exclude him from his property during the deer depopulation. Williams objected that doing so would "effectively prohibit[] him from videotaping the kill event."

The Department's letter stated that its personnel would "establish a restricted access zone on the property while conducting [the depopulation] operation to maintain a safe working environment." The Department included the statement to comply with Section 43.954(b) of the Parks and Wildlife Code, which requires a notice of deer destruction to explain "any access restrictions imposed on the facility or acreage covered by the permit during the destruction of the deer."[92] Williams does not dispute the Department's claim that restricting access to the facility while wild deer are being shot was necessary to protect the safety of Williams and others, not a prior restraint or other restriction on free speech rights. Nor does he offer any argument or explanation how the Department's compliance with Section 43.954(b)(2) is capable of having anything other than an "incidental impact" on his speech, which is "not sufficient to bring the First Amendment into play."[93]

We sustain this part of the Department's first issue.

## G.     Equal Protection

To state a viable equal-protection claim under the Texas Constitution, *see* TEX. CONST. art. 1, § 3, a plaintiff must show that he was "treated differently from others similarly situated." *Klumb*, 458 S.W.3d at 13. And when "neither a suspect classification nor a fundamental right is involved," the plaintiff "must further demonstrate that the challenged decision is not rationally related to a legitimate governmental purpose." *Id.* Williams made neither showing. He alleged that the

---

[92]     TEX. PARKS & WILDLIFE CODE § 43.954(b)(2).

[93]     *Tex. Dep't of Ins. v. Stonewater Roofing, Ltd.*, 696 S.W.3d 646, 658 (Tex. 2024).

Department treats deer breeding facilities with low fences differently than deer breeding facilities with higher fences, but the relevant inquiry for purposes of waiving sovereign immunity here is whether the Department treated other facilities with high rates of CWD differently than RW Trophy Ranch.[94] Williams made no such allegations. Nor has he made any showing that depopulation is not somehow rationally related to a legitimate government purpose.

We sustain the remainder of the Department's first issue.

## III. Temporary Injunction

The Department also challenges the trial court's order issuing the temporary injunction. A court lacking jurisdiction cannot award injunctive relief, not "even temporarily."[95] Because the Department's sovereign immunity remains intact, and the trial court lacks subject-matter jurisdiction, we also reverse the injunction against it.

## CONCLUSION

Having sustained the Department's issues, we reverse the trial court's orders denying the plea to the jurisdiction and issuing the temporary injunction and render a judgment of dismissal in favor of the Department and Silovsky.

/s/ Scott A. Brister
Scott A. Brister
Chief Justice

Before Chief Justice Brister and Justices Field and Farris.

---

[94]   *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998) (requiring others to be similarly situated in a relevant way).

[95]   *In re Abbott*, 601 S.W.3d 802, 805 (Tex. 2020) (orig. proceeding).